UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :

NETRATINGS, INC.,

                         Plaintiff,

              vs.                   No. 06 Civ. 878 (LTS) (AJP)

WEBSIDESTORY, INC.,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NETRATINGS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

Seth H. Ostrow (SO 9605)
Arianna Frankl (AF 7764)
Karine Louis (KL 6652)
**DREIER LLP**
499 Park Avenue
New York, New York 10022
(212) 328-6100

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

POINT I  BACKGROUND ........................................................................................... 2

A.    CASE HISTORY ................................................................................................ 2

B.    THE PARTIES ................................................................................................... 2

    1.    Plaintiff NetRatings, Inc. ....................................................................... 2

    2.    Defendant WebSideStory, Inc. ................................................................ 3

C.    NETRATINGS' PATENTED INVENTIONS ................................................... 4

    1.    Technology Background ........................................................................... 4

    2.    The '510 and '680 Patent Family ........................................................... 6

    3.    The '637 Patent ........................................................................................ 9

    4.    The '386 and '155 Patent Family .......................................................... 11

POINT II  LEGAL STANDARDS FOR CLAIM CONSTRUCTION ....................... 12

POINT III  NETRATINGS' PROPOSED CONSTRUCTIONS ................................. 14

A.    TERMS FROM THE '510 AND '680 PATENTS ............................................ 14

    1.    *local computer use meter/user meter* ................................................. 14

    2.    *installed in user computer machines* ................................................... 15

    3.    *log of predetermined [machine operation] events; log; events;*
           *machine operation events;*
           *logging predetermined events by a plurality of local computer use meters* .......... 17

    4.    *stored in memory of said computer machines; stored in an associated user*
           *computer machin; storing each of the events in said log in the local computer*
           *memory of said user computer systems; storing said log of predetermined events*
           *by each use meter in an associated user computer machine* ................................ 20

    5.    *identify titles of open windows and reflects a log of titles of*
           *worldwide web pages; identify titles of windows and world wide web pages* ....... 21

    6.    *identifies character strings reflecting on-line activity* ........................... 23

    7.    *dictionary/dictionary file* ..................................................................... 24

    8.    *correlates said titles to identifiable labels* .......................................... 25

    9.    *generating a log of machine operation events in each of a plurality of user*
           *computer systems* ................................................................................... 26

          10.     *transferring said stored events from said plurality of user computer systems to a processing station computer* ................................................................26

**B.**     TERMS FROM THE '155 AND '386 PATENTS ...........................................27

          1.     *resource; resource use data* .............................................................27

          2.     *tracking program; embedded; the tracking program is embedded in the Web page; executable program; executable program not being part of the resource* ...............................................28

          3.     *monitor use of the resource; monitoring input device events; monitoring details of choices made by a user of the first client using an input device of the first client; monitor interaction through the client computer with at least one of the first resource and one or more second resources* .......................................30

          4.     *client identifying indicia* ...............................................................32

          5.     *[comprises] data representative of a plurality of preferences of a user; [comprises] data representative of a plurality of interests of a user* ...................33

          6.     *the choices being associated with at least one of the first resource and the one or more second resources* ...........................34

          7.     *storing resource use data associated with the monitored interaction; storing the resource use data in the client computer* .......34

          8.     *downloading the tracking program from a second server of the one or more servers; the first server and second server comprising two servers* ....................35

**C.**     TERMS FROM THE '637 PATENT ...........................................................35

**D.**     APPLICATION OF 35 U.S.C. § 112 (6) TO THE '637 AND '510 PATENTS .............36

          1.     *Means Plus Function Terms* ...........................................................36

          2.     *"Instructions" Terms* .....................................................................41

CONCLUSION ..................................................................................................43

# TABLE OF AUTHORITIES

## CASES

*Affymetrix, Inc. v. Hyseq, Inc.*,
   132 F. Supp. 2d 1212 (N.D. Cal. 2001) ................................................................26, 27, 28, 42

*Avocent Redmond Corp. v. Raritan Computer, Inc.*,
   01 Civ. 4435, 2005 WL 612722 (S.D.N.Y. Mar. 11, 2005) ....................................................42

*Bd. of Regents of the Univ. of Texas Sys. v. Eastman Kodak Co.*,
   Civ. Action No.: SA-04-CA-912-XR,
   2006 U.S. Dist. LEXIS 7997, (W.D. Tex. Jan. 26, 2006) ......................................................37

*Briggs & Riley Travelware, LLC  v. Paragon Luggage, Inc.*,
   No. 01 Civ. 3448, 2002 WL 31819205 (S.D.N.Y. Dec. 13, 2002) .........................................36

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) .............................................................................................19

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
   438 F.3d 1374 (Fed. Cir. 2006) .............................................................................................25

*Cybor Corp. v. FAS Techs.*,
   138 F.3d 1448 (Fed. Cir. 1998) .............................................................................................35

*Digeo, Inc. v. Audible, Inc.*,
   Case No. C05-464 JLR,
   2006 U.S. Dist. LEXIS 22715 (W.D. Wash. Mar. 27, 2006) .................................................37

*Joao v. Sleepy Hollow Bank*,
   418 F. Supp. 2d 578 (S.D.N.Y. 2006) ...................................................................................12

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
   382 F.3d 1354 (Fed. Cir. 2004) ...................................................................................26, 41, 42

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)................................12, 35

*McKesson Info. Solutions LLC v. The Trizetto Group, Inc.*,
   426 F. Supp. 2d 197 (D. Del. 2006) ......................................................................................37

*Novartis Pharms. Corp. v. Apotex Corp.*,
   No. 02 Civ. 8917, 2006 WL 626058 (S.D.N.Y. Mar. 13, 2006) ............................................13

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
    429 F.3d 1364 (Fed. Cir. 2005) ........................................................................ 17

*Phillips v. AWH Corporation,*
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................ *passim*

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001) ................................................................. 19, 24

*United States Philips Corp. v. Iwasaki Elec. Co.,*
    No. 03 Civ. 0172 (PKC),
    2006 WL 20504 (S.D.N.Y. Jan. 3, 2006) .............................................................. 12

*Universal City Studios, Inc. v. Reimerdes,*
    82 F. Supp. 2d 211 (S.D.N.Y. 2000) ................................................................. 42

*WMS Gaming Inc. v. Int'l Game Tech.,*
    184 F.3d 1339 (Fed. Cir. 1999) ....................................................................... 36

## STATUTES

35 U.S.C. § 112 (6)................................................................................................ *passim*

## MISCELLANEOUS

Robert C. Faber, *Landis on Mechanics of Patent Drafting,* § 20
    (Practising Law Institute Third Ed. 1990). ................................................. 19, 26

## PRELIMINARY STATEMENT

Plaintiff NetRatings, Inc. ("NetRatings") submits this opening brief in support of its construction of terms from asserted claims of the patents in this action.

This case is a dispute between competitors in the growing field referred to as Web analytics, in which companies track and report on how people use various resources on the Web. NetRatings, in this business since 1997, owns a portfolio of key patents in the field, five of which are asserted in this case (the "asserted patents").[1] WebSideStory, Inc. ("WebSideStory") is one of several competitors sued by NetRatings for infringing the asserted patents.

Even though the terms in the claims of the asserted patents are largely common, readily understood words which should have obviated the need for the Court to undertake an extensive definitional exercise in this case, WebSideStory initially proposed over 60 terms for construction by the Court (to be contrasted with NetRatings' identification of 20 terms for construction). WebSideStory's list includes many terms for which NetRatings believes the ordinary meaning is apparent.

Where NetRatings follows the mandate of the Federal Circuit with its proposed constructions, relying on the intrinsic evidence, affirmed by relevant dictionary and treatise definitions, WebSideStory repeatedly endeavors to limit the claims to described embodiments and impose arbitrary and unduly narrow definitions on claim terms that have no basis in the intrinsic evidence. WebSideStory's tactics can only be viewed as desperate attempts to avoid a dead-on infringement case. The fact is that WebSideStory will be shown to infringe, even under its own

---

[1] The asserted patents are U.S. Patent Nos: 5,675,510 (the "'510 patent"); 6,115,680 (the "'680 patent"); 6,138,155 (the "'155 patent"); 6,763,386 (the "'386 patent"); and 6,108,637 (the "'637 patent"). Each asserted patent is annexed as Exhibits A-E to the Joint Appendix of Exhibits that will be filed with the Parties' Responsive Claim Construction Briefs (hereinafter references to the Joint Appendix will follow the form: "JA Ex. __, p. __").

constructions.  Still, the asserted patents must be construed properly and in a manner which will facilitate the jury's understanding at trial.  NetRatings' constructions meet these goals and satisfy the prevailing standards for claim construction.  Accordingly, NetRatings' constructions should be the Order of this Court.

**POINT I**

**BACKGROUND**

**A.      Case History**

NetRatings filed its complaint on or about February 3, 2006.  *See* Docket Item 1.  The parties have been engaged in initial discovery since April 7, 2006, with fact discovery set to close on February 23, 2007.  Pursuant to the Court's Scheduling Order entered on April 3, 2006, the parties exchanged lists setting forth the terms in the asserted patents they contend – require interpretation, and the proposed meeting of the terms, on May 24, 2006.  The parties then proceeded to meet and confer in order to attempt to reduce the number of terms to be construed by the Court, but the discussions met with limited success.[2]

**B.      The Parties**

**1.      Plaintiff NetRatings, Inc.**

NetRatings, founded in 1997, is based in New York City and Milpitas, California, and has offices in those cities as well as in Oxford, UK and Sydney, Australia.  NetRatings provides Internet and digital media measurement and analysis to clients world-wide in the media, technology, advertising, financial services, consumer products, retail and travel industries.

---

[2]  Markman proceedings with respect to the asserted patents have occurred in *NetRatings, Inc. v. Coremetrics, Inc.*, 05-314 (D. Del.).   A Markman hearing took place on July 6, 2006 before Judge Sleet, and subsequently supplemental briefing was ordered, which has since completed.  No ruling has yet been issued.

NetRatings offers a broad range of technology-driven Internet information products and services that enable customers to make informed decisions regarding their Internet strategies.  For example, NetRatings' products provide the ability to learn what Web sites users are visiting, details regarding Internet user preferences and advertising campaign effectiveness.  NetRatings' products provide browser-based measurement information on individual sites, such as finding out where customers enter a Web site and how they navigate through the content.

### 2.    Defendant WebSideStory, Inc.

Defendant WebSideStory, describes itself as " . . . a leading provider of on-demand web analytics services."  NetRatings, Inc.'s Appendix of Exhibits, WebSideStory, Inc.'s Form 10-K, period through 12/31/04, filed March 29, 2005, A007 (App. Ex. 1).[3]  According to WebSideStory, its customers use the WebSideStory Active Marketing Suite of services "to better understand how Internet users respond to website design and content, online marketing and e-commerce offerings and to manage the content of their web pages and make them searchable."  WebSideStory, Inc.'s Form 10-Q, period March 31, 2006, filed May 10, 2006, A010 (App. Ex. 2).  WebSideStory further states: "We derive most of our revenue from HBX[TM], one of our web analytics applications in our Active Marketing Suite.  Web analytics refers to the collection, analysis and reporting of information about Internet user activity.  Our HBX application collects data from web browsers, processes that data and delivers analytic reports of online behavior to our customers on demand, allowing them to improve their websites and their online marketing campaigns."  *Id.* at A010-11.

---

[3] Hereinafter references to NetRatings, Inc.'s Appendix of Exhibits, submitted herewith, will follow the form: "A __ (App. Ex. __)."

**C.      NetRatings' Patented Inventions**

**1.      Technology Background**

In computer networks, such as the Internet, individual computer users use their computers (which may also be referred to as "client" computers) to access various types of resources on the network.  These resources, examples of which are commonly known (such as Web pages, games, ad banners, *etc.*), are sometimes also referred to as "content."  In the context of the Web, resources generally consist of HTML documents.  An HTML document is stored on a server located at a content provider site (*e.g.,* servers operated for a retail store like Sears) and is made up of text and references to other resources, or content, from different locations on the Web.  *See, e.g.,* '637 patent, col. 2, ll. 24-29; '155 patent, col. 5, ll. 17-27.

Client computers use a computer program such as a browser (*e.g.,* Microsoft's Internet Explorer) to select and display Web pages stored at different content provider sites.  *See* '637 patent, col. 2, ll. 6-12.  Generally, a client computer makes a "request" to a server computer at a content provider site to obtain the content and, upon receipt of the request, the server computer at the content provider site transfers the content, such as an HTML document for a Web page, to the client computer.  *See, e.g.,* '637 patent, col. 2, ll. 11-24.  The browser at the client computer uses the HTML document to generate a display of the Web page or other resource on the client computer.  '637 patent, col. 2, ll. 28-36.

With the rapid expansion of the use of personal computers during the early 1990s, the desire to measure the use of computer related resources and the dissemination of electronic information increased significantly.  '510 patent, col. 1, ll. 10-33.  However, until the inventions described in the asserted patents, information regarding such use was only collected at the server side, that is, the location of the server computer which received the requests for content.  The server computer would log every request for content that was received by it, creating a record that

is often referred to as a "log file." *See, e.g.,* '637 patent, col. 1, l. 65 – col. 2, ll. 36. This server

side data collection method had a serious disadvantage however. Specifically, it did not (and still

cannot) provide information about what was occurring at the client computer (or "client side")

after the content has left the server. For instance, the server computer, while capable of recording

every request that is received by it from multiple client computers, cannot record requests made

by the same client computers to other server computers. Thus, a company like Sears can

determine, using its server computer, how many requests were made for content at its own Web

site, but Sears cannot determine how many requests were made at JC Penney's Web site.

Similarly, Sears cannot tell whether the same Internet user that made a request at its Web site, also

made a request at the JC Penney Web site. Nor can Sears determine, using its server computer,

what an Internet user did with the content Sears provided in response to the request. In other

words, the server computer cannot capture what is occurring at the client computer or monitor the

user's display, use or interaction with the content it provides.[4]

The numerous, significant inventions claimed in NetRatings' asserted patents solved these

and other problems associated with the prior art. The inventions of the '510 and '680 patents

provided the breakthrough technology of putting software on the client computer to monitor what

Internet users were doing on the Web. Through the inventions of the '510 and '680 patents, it is

now possible to determine what Web sites multiple Internet users are going to, and what Web sites

individual Internet users have been to.[5] The inventions of the '637 patent took this technology a

---

[4] There are other deficiencies with server side data collection, including, for example, that the log file may
not accurately represent unique requests for a single Web page, may be subject to manipulation, or may not
accurately reflect the requestor, *etc.* '637 patent, col. 2, l. 62 – col. 4, l. 31.

[5] Thus, where software on the server side can log how many requests for content were made at *one specific*
Web site, software on the client side can log how many requests for content were made by each client
computer to *any* Web site. The software used at the client side may be written in many computer
programming languages, such as C++, Java or Javascript, to name just a few examples. A preferred
language is one which is platform independent – and therefore can be implemented on most client

step further in delineating that the software used to monitor what was occurring at the client computer be downloaded from content provider sites, and using such software to monitor the display of content that was downloaded to the client computer. Finally, with the inventions of the '155 and '386 patents, additional ways of obtaining the monitoring software were identified and the collection of specific details regarding Internet users' use and interaction with resources, such as Web pages, was enabled. Collectively, all of this technology now forms the basis for the Web analytics industry.

  2.  **The '510 and '680 Patent Family**

  The '510 and '680 patents relate to monitoring – using software located on individual client computers – what individuals are doing on their computers and analyzing and reporting on the collected data. *See* '510 patent, col. 1, ll. 5-8; col. 2, ll. 12-50. This is accomplished by capturing data at the client computer that identifies what software applications and resources, such as Web pages, the user is accessing. *See, e.g.,* '510 patent, col. 1, ll. 22-23, 36-44; col. 2, ll. 21-50. Collected information is transmitted from the individual computers to a central processing location, where the information from many individual computers may be assimilated, translated, evaluated and reported on. *See, e.g.,* '510 patent, col. 2, ll. 62-67. The data collected, for example, identifies or describes open windows on a client computer (as in one example of the '510 patent, identifying an e-mail window from America Online) or strings of characters reflecting on-line activity (as in an example from the '680 patent, a URL which specifies a location on the Web).[6] *See, e.g.,* '510 patent, col. 4, ll. 12-24; col. 2, ll. 35-50.

---

computers, regardless of the specific configurations of such computers. *See, e.g.,* '637 patent, col. 11, ll. 42-52.

[6] URLs, or Uniform Resource Locators, identify locations on the Web from which data or a computer program may be downloaded.

In one embodiment, as shown in Figure 1 from the '510 and '680 patents reproduced below, a meter (1) installed on a personal computer logs events occurring at that computer, such as a user's accessing a Web page, and transmits (at 2) the data (11) to a central processing station. The central processing station collects data from multiple separate personal computers and loads the data into a database (13). A data dictionary (14) interprets the data and the interpreted data is used to generate reports (at 6) showing information derived from the data. Accordingly, the Web usage activity from multiple individual users is collected and reports can be provided that show information such as how many different people went to a particular Web site, or what different Web sites a specific person visited.



*FIG. 1*

Fig. 1, '510 and '680 patents.

**3.      The '637 Patent**

The '637 patent describes improved ways of delivering computer code to user computers over a network and for monitoring the display and observation of content provided to such users over the network.  *See* '637 patent, col. 1, ll. 5-12.  In particular, the '637 patent describes programs that enable monitoring, at user computers, of details associated with the display of content in a particular Web page to produce monitoring information from which conclusions regarding the observation of the display may be deduced.  '637 patent, col. 6, ll. 44-48.

In one embodiment, as shown in Figures 3A, 3B and 3C of the '637 patent, reproduced below, a request for a Web page is made to a content provider such as a Web site.  *See* Fig. 3A. The computer code for monitoring the display of the Web page is transferred to a user computer with the Web page.  *See* Fig. 3B.  *See also* '637 patent, col. 11, ll. 57-63.  In various embodiments of the '637 invention, the computer code detects details regarding the display of the Web page, such as how long the Web page was displayed, whether it was displayed at the same time as another Web page and the size or position of the display.  *See, e.g.,* '637 patent, col. 13, ll. 30-67. The collected information is then transferred back to the content provider, as shown in the example of Fig. 3C or to a third party that collects and reports on such information on behalf of many content providers.



Figs. 3A-3C, '637 patent.

4.      The '386 and '155 Patent Family

The '386 and '155 patents build on the core data collection mechanisms provided in the

'510, '680 and '637 patents by describing techniques for alternative delivery of monitoring

programs to users and for monitoring details of individuals' use of and interaction with resources

such as Web pages. *See, e.g.,* '155 patent, col. 1, ll. 12-17.  In some embodiments, a tracking

program for collecting data regarding the use of the resource is downloaded from a different

server on the network from the server that provided the resource. *See, e.g.,* '155 patent, claim 1.

The server that provides the computer tracking program in this latter example can be dedicated to

providing the program to multiple client computers.  This may be beneficial in permitting, among

other things, changes to be made to the program at the one server rather than at all the different

client computers.

As described in the '386 and '155 patents, the type of data collected might include data

regarding an individual's interaction with a resource such as an interactive ad banner or game and

indicate, for instance, what features of a game were played. *See, e.g.,* '386 patent, col. 13, ll. 56-

65.  The patent also makes possible, among other things, the collecting of data about the use of a

resource, as well as data that may enable an association to be made between the use data and the

client computer (or user computer) on which the use occurred. *See, e.g.,* '155 patent, col. 5, ll. 1-7;

'386 patent, col. 4, ll. 29-42.  For example, a database of information can be created using

collected data that includes information about users who have visited a Web site and includes

information about such users' use of the site, such as what different pages on the site the user went

to and in what order.  The information in the database can be analyzed to facilitate the

determination of individual user interests and also regarding user preferences. *See* '386 patent,

col. 12, l. 61 – col. 13, l. 26.

## POINT II

## LEGAL STANDARDS FOR CLAIM CONSTRUCTION

The basic standards for construing patent claims are well known.  The Court determines the meaning of pertinent claim language to establish the scope of the patent's claims for purposes of determining questions of infringement and validity.  *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978-79 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996).  In its most recent *en banc* pronouncement concerning claim construction, *Phillips v. AWH Corporation,* 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit reaffirmed and clarified the basic rules of claim construction.

"[T]he words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question "as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1312-13.  *See also Joao v. Sleepy Hollow Bank,* 418 F. Supp. 2d 578, 581 (S.D.N.Y. 2006).  The person of skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips,* 415 F.3d at 1313. *See also United States Philips Corp. v. Iwasaki Elec. Co.,* No. 03 Civ. 0172 (PKC), 2006 WL 20504, at *1 (S.D.N.Y. Jan. 3, 2006).

Where the ordinary meaning of claim language is readily apparent, as it is here in the overwhelming number of claim elements, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips,* 415 F.3d at 1314.  In such a case, "general purpose dictionaries may be helpful." *Id.*  Where the meaning of terms is not clear, Courts may look to sources available to the public that will help determine how a person of skill in the art would understand the disputed claim language. *Phillips,* 415 F.3d at 1314.

The Court should look to the claim language in which the disputed term appears, and may also consider other claims of the patent in question (whether asserted or not). Similarities and differences among claims may be instructive. *Id.* at 1314-15. For example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

The claims should be read in view of and so as to be consistent with the specification of the patent. If the patentee provided a special definition for a term in the specification, that construction should govern. *Id.* at 1316. However, as *Phillips* reiterated, courts must avoid reading limitations from the specification into the claims. *Id.* at 1323; *Novartis Pharms. Corp. v. Apotex Corp.*, No. 02 Civ. 8917, 2006 WL 626058, at *4 (S.D.N.Y. Mar. 13, 2006) (declining to import limitations from specification). Although a specification often describes very specific embodiments of the invention, or only one embodiment, claims are not to be construed as being limited to the described embodiments. *Phillips,* 415 F.3d at 1323.

The Court may also consider the prosecution history of the patent, if in evidence, which it is here. Still, because the prosecution history reflects an "ongoing negotiation" between the applicant and the patent office, the prosecution history is often "less useful for claim construction purposes." *Phillips* at 1317; *Novartis Pharms. Corp.,* 2006 WL 626058, at *3.

The Court may also consider extrinsic evidence (all evidence other than the patent and prosecution history) but such evidence is less significant in determining the meaning of claims and should be considered in view of the intrinsic evidence. *Phillips* at 1317-18; *Novartis,* 2006 WL 626058, at *3. NetRatings applies these principles in the following points.

## POINT III

### NETRATINGS' PROPOSED CONSTRUCTIONS

**A.**     **Terms From the '510 and '680 Patents**

    **1.**     *local computer use meter/user meter*

Consistent with the manner in which this term is used in the patents, a "local computer use meter" and a "user meter" should be defined as "a software program designed to collect information regarding the use of other software programs on a computer on which the software program is installed." The intrinsic evidence clearly indicates that the 'meter' is software (*e.g.,* a software application). *See, e.g.,* '510 patent, col. 2, ll. 21-22, 36-38; '680 patent, col. 2, ll. 28-30, 42-44 (referring to a "meter application").[7] *See also* JA Ex. F, at JX00478 ('510 Patent, Response Under 37 C.F.R. §1.111 dated Dec. 26, 1996, at 3) (explaining that a "computer use meter in the form of a software module is installed on personal computers"). This intrinsic evidence, along with the use of the term "local," further indicates that the meter is designed to collect information regarding the use of software on a computer on which the software is installed. *See, e.g.,* '510 patent, col. 1, ll. 36-38; col. 2, ll. 21-23, '680 patent, col. 1, ll. 44-46; col. 2, ll. 28-30 ("object of the invention to facilitate . . . collection of reliable information regarding the use of personal computer software;" "meter application installed in a personal computer may log events for top-level Windows for any given application"). *See also* '510 patent, col. 5, ll. 6-8; '680 patent, col. 5, ll. 44-46 ("system is provided to collect, process and deliver information regarding use of personal computer resources").[8]

---

[7] The patents repeatedly refer to applications and programs as software types. *See, e.g.,* '510 patent, col. 1, ll. 57-64 (different applications tracked), col. 2, ll. 5-6 (executable programs identified), col. 3, ll. 6-16 (meter software upgraded), col. 3, ll. 44-47 (use of "software product or application program" recorded).

[8] In view of space limitations, NetRatings addresses only certain erroneous aspects of WebSideStory's constructions in this brief, and reserves further discussion for the responsive briefing.

WebSideStory's proposed construction of "local computer use meter/use meter," is inappropriate because, among other reasons, it contains two inappropriate and unsupportable limitations: (1) that the meter run "independently" from other software programs, and (2) that the meter collects information only about other software programs "running on that personal computer." Joint Claim Construction Chart row 1.[9]  With respect to the inclusion of the word "independently," this limitation added by WebSideStory is not supported by the intrinsic evidence, and equally problematic, it creates an unacceptable ambiguity in so far as what it would mean for a software program to run "independently" of other programs.  WebSideStory's construction would seemingly preclude the described invention by prohibiting the meter from interacting with the very programs about which the meter is collecting information.  Thus, rather than clarifying and confirming what is meant by the claim language, WebSideStory's construction confuses it.  Further, with respect to the types of programs about which the meter may collect information, WebSideStory adds the concept that the programs must be running.  This addition unnecessarily complicates the construction.  Both parties already include the concept that the meter collects information about programs which are in "use."  The further inclusion of the concept of running -- which occurs twice in WebSideStory's construction -- only serves to confuse rather than clarify.  For the foregoing reasons, WebSideStory's construction should be rejected and NetRatings' construction adopted as the order of the Court.

**2.  *installed in user computer machines***

The meter application of the '510 and '680 patents is "installed in user computer machines."  *See* '510 patent, claim 1; '680 patent, claims 1, 12.  *See also* '510 patent, col. 2, ll. 21-23; '680 patent, col. 2, ll. 28-30 (meter application is "installed in a personal computer").  What

---

[9] Hereinafter references to the Parties' Joint Claim Construction Chart, submitted herewith, will follow the form: "JCCC ___."

this means is that the meter is "placed on and ready for use by a user computer."  The purpose of

installing the meter on client computers is to permit the meter to run on the <u>client computer</u> and

collect data about locally occurring events, as opposed to being installed <u>on server computers</u>.  *See*

*supra* pp. 4-8.

WebSideStory attempts to improperly limit the construction of this term to require that the

meter be installed in a specific location in the computer ("permanent program storage"), that the

meter be placed on the computer through "direct user action" and not be removed without "direct

user action," among other things.  JCCC at row 3.These limitations are simply extraneous,

unsupported attempts in a futile effort to avoid infringement.  The claim language at issue

specifies where the meter is installed -- user computer machines -- and not in some specific part of

such machines.[10]  Moreover, the patents state that "[a]fter an initial installation process, the

system may be completely passive . . . the computer user does not have to take any additional

action for the system to operate effectively."    '510 patent, col. 3, ll. 41-44; '680 patent, col. 4, ll.

7-10.  With respect to the term at issue, the foregoing language in the patent makes at least a few

things clear: (1) there may be user action involved in installation, (2) there may not be, and (3) the

user action may or may not have any direct relation to the installation process.  WebSideStory's

construction, in requiring "direct user action," would thus exclude an explicit embodiment of the

---

[10]  Computers have different memory and storage devices, among other things, and WebSideStory arbitrarily
picks just one. *See, e.g., IBM Dictionary of Computing* (George McDaniel ed., 10th Ed. 1993) ("*IBM*") at
A021 (App. Ex. 3) (defining personal computer as "(2) A desk-top, floor-standing, or portable microcomputer
that usually consists of a system unit, a display monitor, a keyboard, one or more diskette drives, internal
fixed-disk storage, and an optional printer."). *See also* A024-28 (App. Ex. 4) *Webopedia Computer
Dictionary* at http://www.webopedia.com/TERM/C/computer.html ("[a]ll general-purpose computers require
the following hardware components: <u>memory</u>: Enables a computer to store, at least temporarily, data and
programs; <u>mass storage</u>: Allows a computer to permanently retain large amounts of data.  Common mass
storage devices include disk drives and tape drives; <u>input device</u>: Usually keyboard and mouse, the input
device is the conduit through which data and instructions enter a computer; <u>output device</u>: A display screen,
printer, or other device that lets you see what the computer has accomplished; <u>central processing unit</u> (CPU):
The heart of the computer, this is the component that actually executes instructions.").  It would be error to
constrict the definition as WebSideStory proposes.

patents, and adopting such a construction would be error. *See Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1374 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment... is 'rarely, if ever, correct.'" (internal quotations omitted). NetRatings' definition on the other hand is consistent with the patents as well as the ordinary meaning of the word "install," which focuses on something being set in place and made ready for use. *See The Merriam-Webster Dictionary* (1997) ("*MW*") at A032 [install] (App. Ex. 6) (to set up for use or service); *Webster's II New College Dictionary* (1995) ("*Webster's II*") at A042 [install] (to set in position or adjust for use). *See also McGraw-Hill Dictionary of Scientific and Technical Terms* (Sybil P. Parker ed., 5th Ed. 1994) ("*McGraw-Hill*") at A052 (App. Ex. 7) (installation: "procedures for setting up equipment for use or service"); *IBM* at A018-19 [install] ("(1) to add a program, program option, or software to a system in such a manner that it is runnable and interacts properly with all affected programs in the system.").

**3.**     ***log of predetermined [machine operation] events;*[11] *log; events; machine operation events; logging predetermined events by a plurality of local computer use meters***

As described in the specifications, the meters record data regarding events relating to the "use of personal computer software" and on-line services, for example. *See, e.g.,* '510 patent, col. 1, ll. 36-44. The types of events for which data is collected are selected in advance to facilitate the collection – in other words, the software meter is programmed to collect data on selected events, if and when they occur, in which case it operates to collect that type of data. In accordance with the ordinary meaning and the patents, the term "log of predetermined [machine operation] events"

---

[11] The phrase "log of predetermined machine operation events" appears in claim 1 of the '510 patent. The phrase "log of predetermined events" (without being limited to *machine operation* events) appears in claims 1, 4, 10-12, 15, 21 and 22 of the '680 patent.

should be defined as "a record of data regarding the occurrence of pre-selected potential events [related to machine operations]."

Data regarding events that may be recorded include, by way of example, "message types such as launch, terminate, switch, minimize, restore," and "date, time, household ID number, individual within the household using the computer," among others. '510 patent, col. 2, ll. 1-7, 28-33; '680 patent, col. 2, ll. 9-15, 35-40. *See also* JA Ex. F, at JX00478 ('510 Patent, Response Under 37 C.F.R. §1.111 dated 12/26/96, at 3 (explaining that "the computer use meter captures and identifies any world wide web pages which are being used by the user")).  NetRatings' proposed definition is fully in accord with the ordinary meaning of the words "log" (a record) and "predetermined" (decide/determine beforehand).  *See IBM* at A020 [log]; *McGraw-Hill* at A053 [log]; *Webster's II* at A043 [log], at A045 [predetermine]; *MW* at A033 [log], A035 [predetermine].

WebSideStory seeks to have several words within this phrase (log, events, machine operation events) construed separately.  In the context of the '510 and '680 patents, the definitions of these terms are straightforward.  As discussed immediately above, consistent with the patents and the ordinary meaning of the word, a log is a "record."  *See, e.g.,* '680 patent, col. 2, ll. 28-56; col. 4, ll. 6-31; col. 5, ll. 24-32; Fig 1.  *See also McGraw-Hill* at A053 (multiple definitions in different contexts, all a "record" of various items); *MW* at A033 ("regularly kept record"); *Webster's II* at A043 (a "record" of "events").  Events in the context of the patents and based on the ordinary meaning should be construed as "occurrences or actions detectable by a computer." *See, e.g., Microsoft Press Computer Dictionary* (3rd Ed. 1997) ("*Microsoft*") at A063 [event], (App. Ex. 8); *IBM* at A017 [event].  *See also* '510 patent, col. 2, ll. 1-7, 22-33; '680 patent, col. 2, ll. 9-15, 28-40.  Machine operation events are "events relating to operations performed on the computer."

WebSideStory's constructions for the foregoing terms shows that it chose the terms for construction for the purpose of building narrowing limitations into each term, even though there is no support for such limitations.  For instance, with respect to "log," WebSideStory's construction requires that the log be "a file" which records "multiple events over a period of time in a time sequential order."  JCCC at row 4.  While there are examples in the specification of logs which indicate multiple events over time, such examples should not be imported into the claim language in order to limit it.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (accused infringer cannot "narrow a claim term []...simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history"); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1345 (Fed. Cir. 2001) (rejecting argument that claims should be limited to examples in the specification where patentee made clear that invention was capable of other embodiments).  Further, while the patents sometimes refer to a log file, they also refer to the log generally, and an event log.  Nowhere do the patents state that the log must always be in the form of a "file."

WebSideStory also chose to construe the related term "logging predetermined events by a plurality of local computer use meters."  Properly construed, this term means "two or more local computer use meters recording data regarding the occurrence of pre-selected potential events."  This construction is fully supported by the specification and the ordinary meaning of the terms in the phrase.  Events and logs are discussed above.  With respect to a "plurality of local computer use meters," a plurality is construed as "two or more."  Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting,* Third Edition, 1990, § 20 (noting that a "plurality" is "used for an indefinite number, two or more").

4.   *stored in memory of said computer machines*; *stored in an associated user computer machine*; *storing each of the events in said log in the local computer memory of said user computer systems*; *storing said log of predetermined events by each use meter in an associated user computer machine*

With respect to "stored in memory of said computer machines," ('510 patent) and "stored in an associated user computer machine" ('680 patent), each of these terms refer to the storing of the log of each patent. *See* '510 patent, claim 1; '680 patent, claim 1. The terms are readily understood upon reading the claim language and should be construed as "placed in memory of the user computer on which the local computer use meter is installed" and "placing each of the events in the log in memory of the user computer on which the local computer use meter is installed," respectively. Other than in the manner that the claim language itself describes details of the storage, the terms should not be limited to storing in a particular location. Similar to the discussion above regarding where the meter is installed, the claims do not limit storage to a particular type of memory device or location with respect to these terms, and there are other possibilities beyond permanent memory or hard drives.[12] For example, "memory" may include both volatile memory (memory that does not persist in the absence of power) and nonvolatile/permanent memory (memory that persists despite a lack of power), as both are capable of providing for the storage and retrieval of data. *See IBM* at A022-22.1 [permanent memory], *Microsoft* at A064-65 [permanent storage]; *McGraw-Hill* at A056 [volatile memory], A054 [nonvolatile memory]. Thus, WebSideStory's construction of these terms is erroneous in

---

[12] *See e.g.,* '510 patent, col. 1, line 65 - 67 (describing that messages may be recorded in a log file and not limiting the type of memory or memory device used to record the messages); '510 patent, col. 3, lines 44 - 47 (describing that the use of software applications may trigger event messages in the operating system that may be recorded though not limiting the recording to a type of memory); '510 patent, col. 4, lines 18 - 19 (describing the recordation of titles of windows and not limiting the recordation to a type of memory); '680 patent, col. 3, lines 51 - 57 (describing storing information input by a user and not limiting the type of memory or memory device used to store the information); '680 patent, col. 4, lines 51 - 53 (describing recording titles of windows and not limiting the type of memory or memory device used to store the recorded titles); '680 patent, col. 8, line 24 - 28 (describing the format used by the log file to store data and not limiting the type of memory or memory device used to store the data).

requiring, with respect to both patents, that the log be "written to the permanent memory (*e.g.,* hard drive)" of the computer.

With respect to the terms "storing each of the events in said log in the local computer memory of said user computer systems" ('510 patent) and "storing said log of predetermined events by each use meter in an associated user computer machine" ('680 patent), the proper constructions of such terms are "placing each of the events in the log in memory of the user computer on which the local computer use meter is installed" and "placing the log of predetermined events logged by each use meter in the user computer," respectively. These constructions account for the full meaning intended in the patents with respect to where storing occurs, as discussed above WebSideStory's constructions of these terms again inappropriately restricts the claims, this time by essentially adding an entire element into the claim which is not there: that the log is stored in one location prior to the element containing these terms, so that for these terms, the log is taken from the prior location and then stored again in the element containing these terms. Such an approach to claim construction in entirely inappropriate and should be rejected.

### 5.    *identify titles of open windows and reflects a log of titles of worldwide web pages; identify titles of windows and world wide web pages*

NetRatings' proposed construction of the foregoing terms are, respectively, "contains characters identifying open windows and reflects a record of characters useful in identifying world wide web pages" and "contain characters identifying windows and world wide web pages." A preliminary dispute between the parties regarding these two terms is whether they should be construed identically (as WebSideStory incorrectly proposes). NetRatings' constructions properly distinguish the two terms to account for the fact that the language in the terms is different: the first term specifies that the windows are "open," whereas the second term does not.

The remaining parts of these terms overlap and so they are treated together for that purpose. NetRatings' constructions are consistent with the patent, and with the ordinary meaning of the words in the phrases. For the word "titles," NetRatings' constructions rely on the patent and the descriptions of the function of the titles therein, which is to know, for example, what Web pages users access by identifying those pages in some manner. *See, e.g.,* '510 patent, col. 4, ll. 11-63 ("[w]indow titles" of applications "generally hold useful descriptions of the activity at that moment"). *See also* '510 patent, Response to Office Action, 12/26/96, pp. 3-4, JA Ex. F, at JX00478-479 (the object of the logging of titles is to *identify what the user is doing on the computer* by identifying, *for example*, "any world wide web pages which are being used by the user") (emphasis supplied). NetRatings' constructions are also supported by the ordinary meaning of the word title as reflected in regular dictionaries. *See, e.g., MW* at A038 (a "distinguishing name"); *Webster's II* at A047 ("an identifying name" or a "general or descriptive heading").

WebSideStory's constructions for these terms go much too far in limiting these terms in requiring, for both constructions and among other things, that the titles comprise the "full names" of open windows or web pages "as they appear in the window's title bar, when the window [or page] is displayed on the computer's display." JCCC at rows 7 and 13. But no such requirement can be found in the intrinsic evidence. Moreover, if the terms mean only this, then at least one objective of the invention, as described in the specification and file history references above, would be frustrated. *See, e.g.,* '510 patent, col. 4, ll. 20-46. This objective is to obtain information that is useful in describing what a user is doing on the computer and this may or may not be possible using what is in the title bar. Consider for example how the text of a title bar can vary depending on the owner of a particular computer or web page. Any text may be placed there using an HTML tag in the HTML document which renders the web page, for instance. This could

be more than needed to provide a useful description of a window or web page, or less (either in terms of insufficient characters or characters which are not in fact descriptive of what the page is). In addition, it is not dependent on whether the window or page is displayed on the screen, as WebSideStory would require.

For these reasons, NetRatings' constructions should be adopted by the Court.

### 6.     *identifies character strings reflecting on-line activity*

NetRatings' construction of this term reflects its straightforward, ordinary meaning.  A character string is a group of characters. *See McGraw-Hill* at A051 (character string is "a sequence of characters").  The remainder of the term explains what the character string does – the characters reflect on-line activity, or, activity performed online.  For instance, the patent discusses how the meter monitors character strings which together indicate a Universal Resource Locators (or URLs), and identifies the location of a particular resource, such as a web page, on the Internet. '680 patent, col. 2, ll. 41-50.

WebSideStory's construction, on the other hand, is a stunning example of how not to construe patent claims.  WebSideStory simply imports an example of one embodiment of the invention, including a description of how the character strings were identified (which is well beyond the language in the claim).  Thus, for the term:

identifies character strings ***reflecting on-line activity***

WebSideStory proposes the following construction:

> Identifies character strings ***that were intercepted while being sent to a communications port whose syntax was recognized by the local computer use meter as being consistent with on-line activity, or identifies titles of windows that the local computer use meter identified as representing on-line activity***.

JCCC at row 17 (emphasis supplied).

As is readily seen, WebSideStory replaces the language "reflecting on-line activity" with several lines of text apparently reflecting an example from the specification. The law does not allow this and WebSideStory's construction should be rejected. *See Rexnord v. Laitram Corp.,* 274 F.3d 1336, 1345 (Fed Cir. 2001) (rejecting argument that claims should be limited to examples in the specification where patentee made clear that invention was capable of other embodiments).

7.    *dictionary/dictionary file*

The "dictionary" of the '510 patent is described in one embodiment as a collection of data which is used to interpret data collected by the meter for reporting purposes. *See* '510 patent, col. 5, l. 64 - col. 6, l. 3. The appropriate construction of "dictionary" in the context of the patent is "a database or file containing entries used to interpret or correlate data." NetRatings' construction is fully supported by the patent specification, file history and the ordinary meaning of the word in the computer science context, and is helpful to clarify the meaning of the term in this context as distinct from the traditional meaning, in other contexts, of a book of definitions. *See, e.g.,* '510 patent, col. 5, ll. 27-40 (dictionary is provided to "interpret" data from logs); Fig. 1 (dictionary shown as a database); JA Ex. F, at JX00479 ('510 patent, Response Under 37 C.F.R. §1.111 to Office Action, 12/26/96, p. 4 (dictionary assists in "interpretation of the event logs")). *See also The New IEEE Standard Dictionary of Electrical and Electronics Terms* (Christopher J. Booth ed., 5th Ed. 1993) ("*IEEE*") at A072 (App. Ex. 9) (dictionary defined as a "list of data items and information about those items, used both to describe and to reference the items").

There are several flaws with WebSideStory's construction of the term dictionary. In the first instance, WebSideStory requires that the dictionary be a file, but to adopt this construction would read claim language out of the claims. Claim 11 of the '510 patent specifies a dictionary, whereas claim 9 of the '510 patent specifies a dictionary file. In other words, to say that the

24

dictionary must always be a file would eliminate a distinction written into the claims. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous"). In addition, WebSideStory's construction would require that the dictionary be "customizable" and that it always identify "the predetermined machine operation events." JCCC at row 8. These limitations are not required by the intrinsic evidence, the ordinary meaning of the term, or logic. While the specification refers to customizing the dictionary, it does not state that the dictionary must always be customizable, nor does it require identification of the predetermined machine operation events (indeed, the dictionary may interpret and correlate such events, without actually identifying them directly in the dictionary).

### 8.     *correlates said titles to identifiable labels*

One function of the claimed dictionary of the '510 patent is that it "correlates said titles to identifiable labels." '510 patent, claim 11. WebSideStory incorrectly contends that the term is indefinite. JCCC at row 14. To the contrary, the term is straightforward and easily understood by one of ordinary skill in the art based on its common, ordinary meaning. Though construction is unnecessary, the term may be phrased, as NetRatings proposes, as "correlates titles to labels identifiable for reporting." This construction relays the ordinary meaning as well as one of the objectives of the '510 patent with respect to this term, and finds full support in the patent specification. *See* '510 patent, col. 5, ll. 6-8 ("system is provided to collect, process and deliver information regarding use of personal computer resources"); col. 5, ll. ("system may generate reports showing information derived from the data base elements maintained," many of which elements are described in the column reference indicated). *See also* '510 patent, Fig. 1 (wherein "identified usage data" is specified at 15 in the Figure and at col. 5, l. 45).

The specification of the '510 Patent describes several examples of "identifiable labels", such as the label "S" which "identifies the file size of an application"; the label "T", which "identifies the Windows title of the application"; and the label "D", which "identifies miscellaneous data, typically the full path of the application." '510 patent, col. 9, ll. 41-45. The specification notes that "[o]ther labels and information could also be logged." *Id.*

As shown here, the term "correlates said titles to identifiable labels" is not indefinite, being described with reference to the claims and specification of the '510 patent and NetRatings' construction of the term should be adopted by the Court.

9.   *generating a log of machine operation events in each of a plurality of user computer systems*

NetRatings' proposed construction of the above term is "generating a log of machine operation events in each user computer system of a group of more than one user computer systems." This is supported by the ordinary meaning of the words in the term and in accord with standard patent terminology: a <u>plurality</u> of user computer systems means <u>more than one</u> user computer system. *See* Robert C. Faber, *Landis on Mechanics of Patent Drafting*, § 20, (Practising Law Institute Third Ed. 1990). WebSideStory's construction is erroneous at least with respect to its incorporation of a limitation regarding where the events occurred, which is not specified in the term, is extraneous and unnecessary.

10.  *transferring said stored events from said plurality of user computer systems to a processing station computer*

The parties' disagreement with respect to the foregoing term is simple -- WebSideStory incorrectly construes "said stored events" as meaning "the log of machine operation events." JCCC at row 12. However, the language of the claim is clear -- what is transferred are the stored events. Whether the events are in the form of a log or otherwise is not specified in the claim, and

there is no reason to add a specific limitation otherwise.[13]   Accordingly, NetRatings' proposed

construction of this term should be adopted, and WebSideStory's unduly limiting construction

rejected.

**B.      Terms From the '155 and '386 Patents**

     **1.      *resource; resource use data***

     As referred to above, the '155 and '386 patents generally involve the collection of data

regarding the use of and interaction with resources.  With respect to the terms "resource" and

"resource use data," the ordinary meaning of the word resource covers a broad range of meanings

that may be described as 'things that can be used.'[14]   NetRatings' proposed construction focuses on

the computer context and the patents in defining "resource" in a more useful way as "computer

data or program," and providing just a few examples from the patents to illustrate the types of

resources that might be involved: "such as in the form of a Web page or part of a Web page,

images, an ad banner, or an interactive game."  *See, e.g.,* '386 patent, col. 5, ll. 15-21; col. 7, ll. 6-

12; col. 8, ll. 16-22; col. 13, ll. 54-61; '155 patent, col. 5, ll. 11-17; col. 7, ll. 10-16; col. 8, ll. 12-

18; col. 13, ll. 58-65.  "Resource use data" is simply "information describing or derived from use

---

[13]  It is possible that WebSideStory's contention is premised on the fact that the next step of the claim specifies "loading said event logs into memory associated with said processing station computer."  '510 patent, claim 11 (at col. 11, ll. 3-4).  However, that event logs are loaded into memory at the processing station does not necessitate that the processing station receives events as logs, or only as logs.  In an embodiment, the events could be received and then logs created or recreated for loading.

[14]  *See, e.g., Microsoft* at A066 ("1. Any part of a computer system or a network, such as a disk drive, printer, or memory, that can be allotted to a program or a process while it is running. 2. An item of data or code that can be used by more than one program or in more than one place in a program, such as a dialog box, a sound effect, or a font in a windowing environment."); *IBM* at A023 ("(1) Any of the data processing system elements needed to perform required operations, including storage, input/output units, one or more processing units, data, files, and programs." and "(2) Any facility of a computing system or operating system required by a job or task, and including main storage, input/output devices, processing unit, data sets, and control or processing programs."); *Webster's II* at A046 (resource: "1. Something that can be looked to for support or aid.  2. An accessible supply that can be withdrawn from when necessary."); *MW* at A037 (resource: "1: a source of supply or support").

of a resource." *See, e.g.,* '386 patent, col. 1, ll. 15-22; col. 4, l. 47- col. 5, l. 11; col. 8, ll. 16-31; col. 9, ll. 6-26; col.11, ll. 23-43; col. 12, l. 61 - col. 13, l. 26; col. 14, l. 31 - col. 14, l. 14.

**2.    *tracking program; embedded; the tracking program is embedded in the Web page; executable program; executable program not being part of the resource***

The claims of the '386 patent specify a "tracking program" used to monitor user interaction with resources. The "tracking program" is properly construed as "computer readable code that monitors use of a computer." This construction is supported by the patent and by the ordinary meaning of what a program is.[15] *See, e.g.,* '386 patent, col. 8, ll. 23-31 (the "tracking program" "monitor[s] various indicia, such as time, mouse events, keyboard events . . . details of choices (such as links) made by individual users within a particular Web page"). WebSideStory's proposed construction of "tracking program" is laden with improper limitations. WebSideStory contends that the tracking program must "operate on a personal computer independently of a browser," must execute "throughout the display of one or more resources in order to generate information about the use of those resources by a user," and must "at least determin[e] an amount of time that the user interacted with (i.e., viewed or used) at least a portion of the resources." JCCC at row 29. Even to the extent that any of the foregoing details are described in the specification, there is no basis for adding such limiting details into the term construction and accordingly WebSideStory's construction should be rejected.[16]

---

[15] *See, e.g., IBM* at A016 ("computer program A sequence of instructions suitable for processing by a computer."); *IEEE* at A070-71 ("computer program . . . (3) (software). A sequence of instructions suitable for processing by a computer."); *McGraw-Hill* at A055 (program: "[COMPUT SCI] A detailed and explicit set of directions for accomplishing some purpose, the set being expressed in some language suitable for input to a computer, or in machine language."); *Microsoft* at A060 (computer program: "A set of instructions in some computer language intended to be executed on a computer so as to perform some task.").

[16] WebSideStory's proposed constructions of both "tracking program," as well as "executable program" appear to be an attempt at limiting the patents to programs written in the Java programming language (a computer language used in exemplary fashion in the '155 and '386 patents). This is yet another reason why WebSideStory's constructions should be rejected, as WebSideStory is simply selecting arbitrary

The tracking program may, but does not have to be, "embedded" in a resource.  In the context of the '386 and '155 patents, embedded means "contained within or incorporated by reference." *See, e.g.,* '386 patent, col. 3, ll. 42-55; col. 5, ll. 22-41; col. 8, ll. 49-63.  For example, a tracking program may be "embedded in a file which is downloaded from a server to a client.  The tracking program need not originate from the same server that sent the file, and may be obtained, for example, via an embedded URL that points to a different server." '386 patent, col. 4, ll. 47-52.  Thus, the tracking program need not be contained within the Web page, but may be embedded where it is obtained by a link and thus incorporated by reference.[17]  As WebSideStory offers no independent construction of the term "embedded," the Court should adopt NetRatings' construction which is fully supported by the intrinsic evidence.[18]

The term "executable program" means a "computer program that can be run on a computer." This construction is consistent with the patent and with the ordinary meaning of the term. *See, e.g.,* '155 patent, col. 5, ll. 27-48 (executable program "runs" on clients or servers). *See also Microsoft* at

---

properties of the Java language and making them claim requirements but the patents in fact specify that other programming languages may be used. *See, e.g.* '155 patent, col. 10, ll. 57-64 and '386 patent, col. 10, ll. 60-67 ("As will be readily appreciated by those of ordinary skill in the art, however, the teachings of the present invention are not limited to JAVA applets or to the JAVA programming language whatsoever. In connection with the Internet, for example, the present invention may also be implemented in a so-called "Active-X" environment, in which the tracking program is written as an Active-X component.").

[17] *See also* '386 patent, col. 5, ll. 31-37 ("The HTML document [Web page] also contains a second embedded URL for pointing to a first executable program . . . the first executable program being embedded inside the HTML document using [a tag] to specify the source URL for the program") and JA Ex. H, at JX01052-1053 ('952 patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR §1.102(d), pp. 10-11 (where the "URL (i.e., the address) of a tracking program is embedded in a resource, such as a Web page," the tracking program is considered to be embedded in the resource)).

[18] Notably, WebSideStory refused to construe the term "embedded," contending that it had to be construed only in the context of the term "the tracking program is embedded in the Web page."  That latter term is easily understood and readily construed once one has determined what "embedded" means, specifically: "the tracking program is contained within or incorporated by reference in the Web page."  Still, WebSideStory manages to complicate even this simple term by proffering a construction that limits the term to the situation where the Web page "contains instructions identifying the location of the tracking program" and "specifying the parameters for rendering its output as part of the Web page."  JCCC at row 33.  Yet again, there is no support for these narrowing limitations and they should be rejected.

A061 (executable program is a "program that can be run"). The term "executable program not being part of the resource" simply refers to an "executable program not contained within the resource." The executable program may, however, be embedded in the resource (as discussed above). *See, e.g.,* '155 patent, col. 8, ll. 13-59; col. 9, ll. 9-16; col. 10, ll. 27-67; col. 11, ll. 2-19. *See also* '952 patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR §1.102(d), p. 11, JA Ex. H, at JX01053 (program is "linked to an HTML document and is downloaded and executed on a client when the HTML document is served to the client").[19]

   3.   *monitor use of the resource; monitoring input device events; monitoring details of choices made by a user of the first client using an input device of the first client; monitor interaction through the client computer with at least one of the first resource and one or more second resources*

With respect to "monitor use of the resource," WebSideStory contends that this term requires construction, using it as an opportunity to put forth an unduly narrow position on what "monitor" means in the context of the '155 (and '386) patent. WebSideStory defines "monitor" as to "keep track, over a period of time," and includes an additional limitation in its construction that the monitoring occurs "once the resource has been downloaded to a personal computer." JCCC at row 22. There is no justification for such a narrow reading of this straightforward term, and nothing in the term which requires a specific time frame – as results from WebSideStory's construction. Moreover, the patent contemplates – consistent with the normal usage of the word monitor – that the monitoring may be accomplished in a variety of ways. Accordingly, NetRatings defines the word "monitor" consistent with the patent and its ordinary meaning as "track, check, observe, detect or capture for a specific purpose." *See, e.g.,* '155 patent, col. 4, ll.

---

[19] There is no way for WebSideStory to justify its construction of "executable program." WebSideStory attempts to require, through its construction, that the program (1) be "compiled," (2) "operate on a personal computer independently of a browser," and (3) execute "throughout the display of a resource." As discussed above, while there may be embodiments of the claimed inventions that incorporate various ones of these features, there are others that do not and there is no justification for limiting the construed terms to only such embodiments. WebSideStory's construction should be rejected.

50-55; col. 8, ll. 19-22. *See MW* at A034 [monitor] ("to watch, check, or observe for a special purpose"); *Webster's II* at A044 [monitor] (definitions include "to check," "to track" or "to keep watch over"). However, NetRatings believes that the word "monitor" most appropriately captures the variety of ways in which monitoring may be accomplished as contemplated by the patents. Thus, while NetRatings proffers a construction for "monitor," NetRatings believes that the word monitor itself should be used in the claim terms, and not its definitional replacement.

The '386 patent contains two dependent claims wherein monitoring user interaction comprises "monitoring input device events." '386 patent, claims 6 and 18. This term means "monitoring operations performed using an input device." *See, e.g.,* '386 patent, col. 4, ll. 55-61; col. 8, ll. 27-30 and 43-49; col. 9, ll. 8-13. Among other issues, WebSideStory again incorrectly imputes a time element to the term "monitoring." As discussed above, monitoring, at least in the context of the patents in suit, may include but does not require a time element. *See, e.g,* '386 patent, col. 8, ll. 24 - 31 ("tracking program may simply monitor the amount of time the user spends interacting with the Web page, or may monitor details of choices (such as links) made by individual users within a particular Web page"); col. 8, ll. 24 - 31 ("tracking program may monitor the length of time the user remains in the Web page . . . and may track some or all mouse and keyboard events to provide meaningful data to the server concerning the user's interaction with the Web page"). Further, in this construction, WebSideStory equates "events" with "changes in the state of a computer" but in construing terms from the '510 and '680 patents, events are construed as "internal messages." In either case, the construction proposed by WebSideStory takes an otherwise straightforward term and complicates it beyond common understanding. WebSideStory's construction should be rejected.

NetRatings' proposed construction of the term "monitoring details of choices made by a user of the first client using an input device of the first client," is "monitoring details of two or more choices made by a user of the user computer using an input device." NetRatings defines the term "monitor interaction through the client computer with at least one of the first resource and one or more second resources" as "monitor interaction through the user computer with a first or second resource." The dispute between the parties with respect to these terms focuses on the word "monitoring," where again WebSideStory builds in a time limitation, attempting to narrow the claim language without support. JCCC at row 30. In addition, the parties dispute what constitutes an input device – WebSideStory's construction requires that the device be "connected" to the computer – but there is no such requirement in the claim or patent. All that is necessary is that it be "a device which enables a user to input data into a computer," as provided by NetRatings' construction.[20] WebSideStory's construction for the "monitor interaction" term is also erroneous because of the added limitation relating to the timing of downloading of the resources being used - - aside from the fact that WebSideStory's inclusion of this concept renders its construction ambiguous, there is no reason to include the concept at all.

### 4.   *client identifying indicia*

The term "client identifying indicia" means "any information that can be used to associate data with a client." This construction follows the '155 patent's description. For example, the patent discusses one object of the invention as creating a database of details of user interaction with network resources. Such a database might include resource information, such as "IP address[es]" combined with client information, such as "client IDs" or "cookies." '155 patent, col. 4, ll. 29-37. Examples of client identifying indicia include "a user's network ID (IP) and client ID

---

[20] Consider, for example, a wireless mouse. There is no physical connection between the mouse and the computer but such a device would surely be considered an input device.

numbers (cookies)." '155 patent, col. 11, ll. 20-24. WebSideStory's construction of this term as

"information that identifies the client" (JCCC at row 25) is incorrect in so far as it reads out the

claim language itself – indicia does not require that the information specifically identify the client,

rather the indicia may be used to associate data with a client.

5.    *[comprises] data representative of a plurality of preferences of a user;*
      *[comprises] data representative of a plurality of interests of a user*

NetRatings' proposed constructions of the foregoing terms (which appear in claims 18 and

19 of the '155 patent) are: "information from which a user's preferences can be determined" and

"information from which a user's interests can be determined," respectively. As discussed *supra*

at 11, the patent describes certain prior methods of collecting information regarding user

preferences and/or interests whereby a user specifically enters his or her preferences and interests.

In some embodiments of the invention of the '155 patent, however, information regarding user

preferences and/or interests is collected by monitoring, for example, the user's use of a resource.

From the collected data, a user's preferences and/or interests may be determined. *See, e.g.,* '155

patent, col. 13, ll. 2-11 ("An analysis of the data on a user-indexed basis would facilitate the

determination of individual user interests and the like. On the other hand, analysis of the data on a

resource-indexed basis would allow the determination of, for example, which Web pages are

viewed the longest and/or most often either by users in general, or by specific users. Thus, it

would be possible to determine if there were different types of users that preferred different

sections of the Web site (because, for example, they spent more time browsing different sections

of the Web site)."). *See also* '155 patent, col. 2, ll. 1-55; col. 12, l. 58 - col. 13, l. 24; col. 13, l. 62

- col. 14, l. 26; col. 14, l. 52 – col. 15, l. 10.[21] In view of the foregoing, NetRatings' constructions

---

[21] The collected data need not actually *constitute* user preferences and/or interests, but rather, as claimed,
the data is "representative" of such things. *See, e.g., MW* at A036 (representative: "1: serving to
represent"; represent: "2: to serve as a sign or symbol of").

of these terms are fully in accord with their ordinary meaning and the intrinsic evidence and should be adopted by the Court.

   **6.    *the choices being associated with at least one of the first resource and the one or more second resources***

NetRatings' construction of this phrase is "choices being associated with a first or second resource." The primary dispute between the parties with respect to this term appears to be in WebSideStory's improper attempt to require, through its construction, that the "choices" must reflect "actions taken by the user" "throughout the time that the one or more resources have been downloaded to the personal computer." JCCC at row 37. As with other of its constructions, WebSideStory tries to build into the claim a timing limitation where none exists in the claim language. Indeed, the claim only requires that the choices be "associated with" the first or second resource. Accordingly, WebSideStory's construction should be rejected.

   **7.    *storing resource use data associated with the monitored interaction*; *storing the resource use data in the client computer***

NetRatings' constructions of the foregoing terms are: "placing resource use data in memory or on a mass storage device" and "placing the resource use data in memory or on a mass storage device of the client computer," respectively. With respect to the "storing" aspect of these terms, WebSideStory adopted NetRatings' construction but added in further, unsupported limitations to the claims. In both terms, WebSideStory's constructions include a purpose aspect – that is, why the storing is occurring. JCCC at row 38. There is simply no reason to incorporate a rationale for the storing into the claim terms – to the extent there is any purpose called for by the claims, that purpose is set forth elsewhere in the claims and should not be added through claim construction.

8. *downloading the tracking program from a second server of the one or more servers; the first server and second server comprising two servers*

NetRatings' construction of the term "downloading the tracking program from a second server of the one or more servers" is "downloading the tracking program from a server other than the first server," which makes clear that the second server is not the first server. Similarly, NetRatings' construction of "the first server and second server comprising two servers" is "the first server is a different machine than the second server." It should be noted that the servers could be of the same type. WebSideStory's constructions are problematic in that they require that the second server be "different from" or a "different server than" the first server, implying that the use of two identical machines would somehow not be covered by the claims. JCCC at rows 23 and 35.

C.  **Terms From the '637 Patent**

The parties have not identified any specific terms from the '637 patent as requiring construction. However, WebSideStory has made a broad generic and so far unjustified statement that every claim of the '637 patent is indefinite, notwithstanding the fact that it proffered constructions for the claims. While NetRatings certainly disagrees with WebSideStory's position -- the '637 patent claims are clearly not indefinite -- as WebSideStory has not provided its rationale, NetRatings reserves full discussion of this issue for its response. Regardless of the substance of their position, *Markman* is not the appropriate time to address validity issues involving a host of evidentiary matters such as expert testimony and factual determinations. *See, e.g., Cybor Corp. v. FAS Techs.,* 138 F.3d 1448, 1454 (Fed. Cir. 1998) (noting that while extrinsic evidence may be used in the process of construing claims, the court does not credit "certain evidence over other evidence" or make "factual evidentiary findings." Though the court's claim

construction may be "enlightened by such extrinsic evidence as may be helpful," the court's claim

construction is still based upon the patent and prosecution history.")

**D.      Application of 35 U.S.C. § 112 (6) to the '637 and '510 Patents**

The parties have agreed that claims 11, 18, 20, 28, 30, 33, 35, 36 and 38-41 of the '637

patent, and claim 9 of the '510 patent, contain means-plus-function elements subject to 35 U.S.C.

§ 112(6).  All of the specific elements from the claims of the '637 patent which the parties have

identified are listed in Table 3 of the Joint Claim Construction Chart, in rows 39-50 and all of the

specific elements from claim 9 of the '510 patent which the parties have identified are listed in

Table 1 of the Joint Claim Construction Chart, in row 9.  As to the remaining elements identified

in Table 3 (rows 51-59), WebSideStory erroneously contends that these elements are subject to 35

U.S.C. § 112(6).  Both categories of elements are addressed in the sections below.

**1.      *Means Plus Function Terms***

In construing means-plus-function elements, the function of the element is first determined,

and then the corresponding structure for performing the function, as described in the specification,

is identified.  *See WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1347 (Fed. Cir. 1999);

*Briggs & Riley Travelware, LLC v. Paragon Luggage, Inc.*, No. 01 Civ. 3448, 2002 WL 31819205,

at *5 (S.D.N.Y. Dec. 13, 2002).  In the context of claim elements where the disclosed structure is a

computer, the structure for such claim elements is the computer, programmed to perform the

algorithms disclosed in the specification.  *See, e.g., WMS Gaming,* 184 F.3d at 1349 ("In a means-

plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed

to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the

special purpose computer programmed to perform the disclosed algorithm.").  In accordance with

*WMS Gaming,* reference to the patent specification to identify the specific algorithms which the

computer code is programmed to perform may be done with explicit reference to text or figures

within the specification, or by reference to column and line numbers. *McKesson Info. Solutions LLC v. The Trizetto Group, Inc.,* 426 F. Supp. 2d 197, 202 (D. Del. 2006) (identification of structure includes identifying "the specific algorithm disclosed in the specification, or where it is disclosed (or otherwise inferred)"); *Digeo, Inc. v. Audible, Inc.,* Case No. C05-464JLR, 2006 U.S. Dist. LEXIS 22715, at *45-46 (W.D. Wash. Mar. 27, 2006) (identifying algorithm by citation to column and line references of approximately 77 lines of text); *Bd. of Regents of the Univ. of Texas Sys. v. Eastman Kodak Co.,* Civ. Action No.: SA-04-CA-912-XR, 2006 U.S. Dist. LEXIS 7997, at *58 (W.D. Tex. Jan. 26, 2006) (identifying algorithm by citation to two figures).

With the foregoing principles in mind, we turn to the specific elements at issue. The means elements from the '637 patent may be considered in five groups: (a) means for monitoring (rows 39 and 42 of Table 3); (b) means for transferring the means for monitoring (rows 43 and 45 of Table 3); (c) means for transferring the monitoring information (rows 44 and 46 of Table 3); (d) means for storing monitoring information (rows 47, 48 and 49 of Table 3); and (e) means for accessing the monitoring information (row 50 of Table 3).[22]  For most of the elements in these groups, the function is as recited in the claim, as identified in Table 3.[23]

With respect to group (a), which includes elements such as "means for monitoring the change in time of a characteristic of a content display" (row 39) and "means for monitoring display of the content" (row 42), the structure for such elements is, in short, a set of computer instructions

---

[22]  In an effort to facilitate the Court's consideration of the means-plus-function issues raised in a more streamlined manner, NetRatings organized the means-plus-function elements into the five groups identified. Notwithstanding these categories, NetRatings has identified in Table 3 of the Joint Claim Construction Chart what it believes is the claimed function and corresponding structure for each of the means-plus-function elements listed therein, and respectfully refers the Court to Table 3 for a full recitation of the same.

[23]  The function for most of the claim elements at issue conforms to the language of each element itself. In a few instances, NetRatings provided further construction for the function of the claim element to address errors in WebSideStory's constructions. Each function is explicitly identified in NetRatings' column of the applicable row of Table 3 of the Joint Claim Construction Chart.

as described in the specification sections cited, which computer instructions cause one or more computer systems to perform the function recited in the claim. *See, e.g.,* '637 patent, col. 10, l. 58 – col. 11, l. 2 ("a set of monitoring instructions (which can be embodied, for example, in a computer program);" "the monitoring instructions cause the client computer at the content display site 302 to monitor the display of the content to produce monitoring information regarding the manner in which the content is displayed").

To illustrate precisely how the structure for each element would be analyzed (for purposes of trial, for instance), one example of the structure for claim 11 (means for monitoring the change in time of a characteristic of a content display) is provided,[24] as follows:

Computer code encoded on a computer readable medium, that, when executed by a computer system, performs the recited function using one or more of the methods of:

- "discern[ing] whether the pointer is located within the content display by monitoring an event that indicates that the pointer has entered the area defined by the content display,"

- "determin[ing] when the on-screen pointer leaves the defined area after each entry, by monitoring another event that indicates that the pointer has exited the area defined by the content display," and/or

- "calculat[ing] the duration of time that the pointer was in the defined area for each entry into the defined area, as well as the total duration of time that the pointer was within the defined area" using "time stamps associated with the entry into and exit from the defined area."

Col. 16, ll. 24-50.

---

[24] In this and the other structure examples provided in this brief, the specific steps of the various methods are not required for each claim. Each example reflects one or more possible combinations of the algorithms disclosed in the specification. There are many such potential combinations disclosed in the specification of the '637 patent for each element (which makes specific recitation of every such combination impractical). Some of such combinations may be entirely distinct, and others might incorporate part of the examples provided, but then include other steps or methods disclosed in the specification. For instance, the specification also identifies a distinct method of "hiding of the content display" as being applicable to the instant element. *See, e.g.,* '637 patent, col. 16, l. 60 – col. 17, l. 6. A full recitation of the specification sections wherein the algorithms for the elements at issue may be found is set forth in NetRatings' portion of the Joint Claim Construction Statement.

The specification explains that the foregoing example ("entry of a pointer into a defined area"), among others, is one example of a monitoring method in accordance with an embodiment of the invention wherein the "monitoring method monitors the change in time of a characteristic of the content display." '637 patent, col. 16, l. 60 – col. 17, l. 6. With this specific association of the specification sections set forth above and the element at issue, there can be no question that the identification of structure is correct.

The elements in group (b) (rows 43 and 45 of Table 3) include "means for transferring the means for monitoring from the content provider site to the content display site in response to the transfer of content from a content provider site." The appropriate structure for these elements comprises computer instructions implemented on a content provider site, computer instructions implemented on a content display site and a communication network, all as described in the specification sections cited by NetRatings in rows 41 and 43 of Table 3. *See, e.g.,* '637 patent, col. 7, l. 66 – col. 8, l. 5 (in one aspect of the invention, "content is provided by a content provider site over a network to a content display site for display at the content display site, a mechanism for monitoring the display of the content can be transferred from the content provider site to the content display site in response to (e.g., together with) the transfer of content from the content provider site").

The elements in group (c) (rows 42 and 44 of Table 3) include "means for transferring the monitoring information to a remote site that is part of the network." The appropriate structure for the elements in group (c) consists of computer instructions implemented on a content display site, computer instructions implemented on a content provider site and a communication network, all as described in the specification sections cited by NetRatings in rows 42 and 44 of Table 3. *See, e.g.,* '637 patent, col. 11, ll. 2-7 ("[T]he monitoring information is transferred from the content display

site 302 to the content provider site 301 over the network communication line 303. (The

monitoring information could, alternatively or additionally, be transferred to another site that is

part of the network.)").[25]  NetRatings' identification of structure for the elements in group (c)

should be adopted by the Court.

  The element in group (d) (rows 45-47) is "means for storing monitoring information at the

remote site."  NetRatings identified the appropriate structure for this element as "any appropriate

database on a computer system at the remote site" as described in the specification sections cited

by NetRatings in Table 2, row 26.  *See, e.g.,* '637 patent, col. 21, ll. 18-21 ("the monitoring

information can be stored in any appropriate database, as known to those skilled in the art of

constructing and managing databases").  NetRatings' position, which includes any appropriate

database, including but not limited to one at an application manager's site, should be adopted.

  The final group in the '637 patent (row 48 of Table 3) consists of "means for accessing the

monitoring information stored at the remote site from a site on the network other than the remote

site, such that the user at the other site can interact with the monitoring information but cannot

modify the monitoring information."  The structure for this element is a set of computer

instructions implemented on a computer system as described in the specification sections cited by

NetRatings in row 48 of Table 3.  *See, e.g.,* '637 patent, col. 23, ll. 14-24 ("a user interface (e.g.,

GUI [graphical user interface]) can be provided on the content provider site computer to enable the

owner (or representative) of the content provider site to access monitoring information").  *See also*

'637 patent, col. 11, ll. 38-56 ("When the invention is used with a computer network or to monitor

---

[25]  *See also* '637 patent, col. 10, ll. 22-32 ("'[c]ontent provider site' refers to a device that is part of the
network and that can provide content to another device that is part of the network," "'[c]ontent display site'
refers to a device that is part of the network and that can receive and display content from another device
that is part of the network," "'[c]omputer network' includes any collection of interconnected computer
systems").

display of content by a computer system, aspects of the invention can be implemented as one or more computer programs that can be executed by a computer to achieve the functionality of that aspect"). NetRatings' identification of structure of this element should be adopted by the Court.

In addition to the foregoing elements from the '637 patent, there is one means-plus-function element to be addressed in the '510 patent, specifically "means for interpreting the logged machine operation events by reference to the dictionary" JCCC at row 9. NetRatings identified the proper structure for this element as a processing system programmed to perform the recited function of interpreting the logged machine operation events by reference to the dictionary, as described in the specification sections cited by NetRatings.

### 2.      *"Instructions" Terms*

WebSideStory takes the position that the "instructions" elements from claims 57, 59, 62, 64 and 65 of the '637 patent, should be treated as means-plus-function elements subject to 35 U.S.C. § 112(6). WebSideStory is incorrect. These claims all generally begin with the following text (or some slight variant for dependent claims): "A computer readable medium encoded with one or more computer programs ... comprising instructions . . . " '637 patent, claims 57, 59, 64 and 65. Within each of those claims (and their dependents) are elements claiming "instructions" for performing certain methods. For instance, independent claim 57 reads as follows:

> 57. A computer readable medium encoded with one or more computer programs for enabling monitoring of the display of content by a computer system, comprising;
> instructions for monitoring the change in time of a characteristic of a content display; and
> instructions for evaluating the change in time of the characteristic of the content display to produce monitoring information regarding display of the content.

None of the claims at issue contain any "means" language. As the Federal Circuit has reiterated on numerous occasions, the absence of such language creates a rebuttable presumption that 35 U.S.C. § 112(6) does not apply. *Phillips,* 415 at 1311. *See also Lighting World, Inc. v.*

41

*Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004); *Avocent Redmond Corp. v. Raritan Computer, Inc.*, 01 Civ. 4435, 2005 WL 612722, at *3 (S.D.N.Y. Mar. 11, 2005) (describing the presumption as "a strong one that is not readily overcome" and declining to construe claims as means plus function claims).

Moreover, "[m]eans-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips,* 415 at 1311. The claims at issue clearly identify sufficient structure in claiming "computer readable medium encoded with one or more computer programs … comprising instructions …" for carrying out the specified elements. This conclusion is fully supported by the case law. *See, e.g., Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1231 (N.D. Cal. 2001) ("§ 112, P 6 does not apply to the terms recited in the form, "computer code that [performs x function]."). The *Affymetrix* Court explained that "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions." *Id.* In the context of the claims and of the patent, there can be no doubt that "instructions" are computer code. *See, e.g.,* '637 patent, col. 32, claim 59 ("instructions . . . begin executing;" "instructions . . . stop executing"). *See also IEEE* at A073 (instruction: "[a] meaningful expression in a computer programming language that specifies an operation to a digital computer.") and *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 222 (S.D.N.Y. 2000) ("computer code" is "primarily [] a set of instructions which, when read by the computer, cause it to function in a particular way"). Accordingly, the claims at issue from the '637 patent (57, 59, 62, 64 and 65) are not subject to 35 U.S.C. § 112(6).

## CONCLUSION

For all the reasons stated above, NetRatings requests that the disputed claim terms be construed in the manner proposed by NetRatings in the Joint Claim Construction Chart.

Dated: September 27, 2006                 Respectfully submitted,

                                          **DREIR LLP**


                                          By: /s/ Seth H. Ostrow
                                              Seth H. Ostrow (SO 9605)
                                              Arianna Frankl (AF 7764)
                                              Karine Louis (KL 6652)

                                          499 Park Avenue
                                          New York, New York 10022
                                          (212) 328-6100

                                          Attorneys for Plaintiff NetRatings, Inc.

43