UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
NETRATINGS, INC.,
                                                          :
                          Plaintiff,
                                                          :
             vs.                                              No. 06 Civ. 878 (LTS) (AJP)
                                                          :
WEBSIDESTORY, INC.,                                       :
                          Defendant.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**NETRATINGS, INC.'S REBUTTAL CLAIM CONSTRUCTION BRIEF**


Seth H. Ostrow (SO 9605)
Arianna Frankl (AF 7764)
Karine Louis (KL 6652)
**DREIER LLP**
499 Park Avenue
New York, New York 10022
(212) 328-6100

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................1

POINT I
WEBSIDESTORY'S REPEATED AND UNSUPPORTED
ATTEMPTS TO READ LIMITATIONS FROM THE
SPECIFICATION INTO THE CLAIMS SHOULD BE REJECTED.............................................2

POINT II

WEBSIDESTORY'S USE OF EXTRINSIC EVIDENCE IS IMPROPER ...................................4

A.      WEBSIDESTORY'S USE OF INVENTOR
        TESTIMONY SHOULD BE DISREGARDED ..................................................................4

B.      ACTUAL PRODUCTS HAVE NO BEARING
        ON CONSTRUCTION OF THE ASSERTED PATENTS ..................................................6

POINT III
WEBSIDESTORY'S INDEFINITENESS ARGUMENTS
SHOULD NOT BE CONSIDERED DURING THE
CLAIM CONSTRUCTION PHASE OF THIS CASE ..................................................6

POINT IV
SPECIFIC TERMS FROM THE ASSERTED PATENTS ..................................................9

A.      TERMS FROM THE '510 AND '680 PATENTS ...........................................................9

        1.      *local computer use meter/user meter* ....................................................9

        2.      *installed in user computer machines* ....................................................11

        3.      *log of predetermined [machine operation] events; log* .........................12

        4.      *stored in memory of said computer machines*;
                *stored in an associated user computer machine*;
                *storing each of the events in said log in the local
                computer memory of said user computer systems*;
                *storing said log of predetermined events by each
                use meter in an associated user computer machine*..............................15

        5.      *identify titles of open windows and reflects a
                log of titles of worldwide web pages*;
                *identify titles of windows and world wide web pages* ...........................17

        6.      *identifies character strings reflecting on-line activity* ...........................19

        7.      *correlates said titles to identifiable labels* .........................................20

        8.      *events; machine operation events* .......................................................22

B.      TERMS FROM THE '155 AND '386 PATENTS ...........................................................23

i

1.   *resource; resource use data*..................................................................23

2.   *tracking program; executable program*.................................................25

3.   *executable program not being part of the resource*..............................28

4.   *monitor use of the resource; monitoring input device events;*
     *monitoring details of choices made by a user of the first*
     *client using an input device of the first client* ......................................29

5.   *client identifying indicia* .....................................................................30

6.   *the choices being associated with at least one of the*
     *first resource and the one or more second resources;*
     *monitor interaction through the client computer with*
     *at least one of the first resource and one or more second resources* ...................31

7.   *storing resource use data associated with the monitored interaction;*
     *storing the resource use data in the client computer* ..............................31

C.   TERMS FROM THE '637 PATENT ...........................................................32

1.   *WebSideStory's Erroneous Arguments Regarding the*
     *Java Applet of the '637 Patent Should be Rejected* ...............................32

2.   *Specific Means Plus Function Terms of the '637 Patent* .......................34

3.   *"Instructions" Terms of the '637 Patent* ................................................36

CONCLUSION......................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
    334 F.3d 1343 (Fed. Cir. 2003)..................................................................35

*Affymetrix, Inc. v. Hyseq, Inc.*,
    132 F. Supp. 2d 1212 (N.D. Cal. 2001) ........................................................40

*Akamai Techs., Inc. v. Cable & Wireless Internet Services, Inc.*,
    344 F.3d 1186 (Fed. Cir. 2003)....................................................................5

*Allen v. McCurry*,
    449 U.S. 90 (1980)......................................................................................38

*Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*,
    222 F. Supp. 2d 423 (S.D.N.Y. 2002).....................................................21-22

*AT & T Corp. v. Microsoft Corp.*,
    No. 01 Civ. 4872 (WHP), 2003 WL 21459573,
    (S.D.N.Y. Jun. 24, 2003) ............................................................................13

*Atmel Corp. v Information Storage Devices, Inc.*,
    198 F.3d 1374 (Fed. Cir. 1999)..................................................................8, 9

*Augustine Med., Inc. v. Gaymar Indus., Inc.*,
    181 F.3d 1291 (Fed. Cir. 1999)....................................................................27

*Beckson Marine v. NFM, Inc.*,
    292 F.3d 718 (Fed. Cir. 2002).......................................................................4

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
    334 F.3d 1294 (Fed. Cir. 2003) ...................................................................15

*Canon Inc. v. GCC Intern. Ltd.*,
    No. 06 Civ. 3324(PKC), 2006 WL 2516568
    (S.D.N.Y. Aug. 29, 2006) ............................................................................13

*CCS Fitness v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002).....................................................................33

*Dow Chemical Co. v. Astro-Valcour, Inc.*,
    47 F. Supp. 2d 294 (N.D.N.Y. Apr. 28, 1999)...............................................15

*Dow Chemical Co. v. United States*,
    226 F.3d 1334 (Fed. Cir. 2000)............................................................ passim

*Edberg v. CPI-The Alternative Supplier, Inc.*,
  156 F. Supp. 2d 190 (D. Conn. 2001)..............................................................................38

*Eolas Technologies Incorp. v. Microsoft Corp.*,
  399 F.3d 1325 (Fed. Cir. 2005)...............................................................................19, 39

*Fonar Corp. v. General Elec. Co.*,
  107 F.3d 1543 (Fed. Cir. 1997)................................................................................

*Glaxo Group Ltd. v. Apotex, Inc.*,
  376 F.3d 1339 (Fed. Cir. 2004)............................................................................. 34-35

*Graco Children's Prods., Inc. v. Regalo Int'l, LLC*,
  77 F. Supp. 2d 660 (E.D. Pa. 1999) ...........................................................................38

*Home Diagnostics, Inc., v. LifeScan, Inc*.,
  381 F.3d 1352 (Fed. Cir. 2004)....................................................................................4

*Honeywell Int'l, Inc. v. IIT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006)..................................................................................28

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
  381 F.3d 1111 (Fed. Cir. 2004)..................................................................................14

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001)..................................................................................32

*JVW Enters. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005)......................................................................6, 14, 36

*Kim v. ConAgra Foods, Inc.*,
  Nos. 05-1414, 05-1420, 2006 WL 2773237,
  (Fed. Cir. Sept. 20, 2006)...........................................................................................25

*Kollmorgen Corp. v. Yaskawa Elec. Corp.*,
  147 F. Supp. 2d 464 (W.D. Va. 2001) ......................................................................38

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004)....................................................................................14

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004)........................................................................... passim

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995)................................................................................5, 18

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996)................................................................................3

*Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*,
    462 F.3d 1344  (Fed. Cir. 2006).............................................................36

*Personalized Media Communications, LLC v. In't Trade Comm'n,*
    161 F.3d 696 (Fed. Cir. 1998)..............................................................8, 9

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*
    429 F.3d 1364 (Fed. Cir. 2005)............................................................7, 13

*Phillips v. AWH Corporation,*
    415 F.3d 1303 (Fed. Cir. 2005)......................................................... passim

*Playtex Prods., Inc. v. Procter and Gamble Co.,*
    400 F.3d 901 (Fed. Cir. 2005)...............................................................3, 4

*Power Mosfet Techs., L.L.C. v. Siemens AG,*
    378 F.3d 1396 (Fed. Cir. 2004)..................................................................6

*RF Delaware, Inc. v. Pac. Keystone Techs., Inc.,*
    326 F.3d 1255 (Fed. Cir. 2003)..................................................................4

*SciMed Life Sys., Inc. v. Advance Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001)................................................................28

*Solomon v. Kimberly-Clark Corp.,*
    216 F.3d 1372 (Fed. Cir. 2000)..................................................................5

*SRI Int'l v. Matsushita Elec. Corp.,*
    775 F.2d 1107 (Fed. Cir. 1985)..................................................................6

*Stairmaster Sports/Medical Products, Inc. v. Groupe Procycle, Inc.,*
    No. Civ. A. 97-396 MMS, 1998 WL 290296
    (D.Del. May 20, 1998).........................................................................7, 8

*Tandon Corp. v. U.S. Intern. Trade Com'n,*
    831 F.2d 1017 (Fed. Cir. 1987)............................................................27, 39

*TM Patents, L.P. v. Int'l Bus. Machines Corp.*,
    72 F. Supp. 2d 370 (S.D.N.Y. 1999).........................................................37

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996)................................................................................4-5, 34

*Warner-Jenkinson Co. V. Hilton Davis Chem. Co.,*
   520 U.S. 17 (1997).........................................................................................................3

*Wilson Sporting Goods Company v. Hillerich & Bradsby Co.,*
   442 F.3d 1322 (Fed. Cir. 2006)....................................................................................21

*WMS Gaming Inc. v. Int'l Game Tech.,*
   184 F.3d 1339 (Fed. Cir. 1999)....................................................................................32

## FEDERAL STATUTES

35 U.S.C. § 112.............................................................................................................. passim

## TREATISES

*Collateral Estoppel of Claim Interpretation After Markman*,
   86 Minn. L. Rev. 1581, 1616-1623 (June, 2002)..............................................................38

## PRELIMINARY STATEMENT

Plaintiff NetRatings, Inc. ("NetRatings") submits this rebuttal claim construction brief in further support of its construction of terms from the asserted patents[1] and in response to defendant WebSideStory, Inc.'s ("WebSideStory") opening claim construction brief ("WSS Br.").

In its brief, WebSideStory pays lip service to the legal principles of claim construction, but then consistently violates them.  For example, WebSideStory acknowledges that it is the claims themselves that define the scope of the invention, but then repeatedly tries to define various claim terms by importing limitations from the specification.  It compounds this error by then picking a specific example in the disclosed embodiments and arbitrarily making it, or, worse yet, properties of it that WebSideStory extrapolates, a requirement of a given claim term.  WebSideStory also cites the basic legal principle that the claims are to be understood primarily based on the intrinsic evidence, the claims, specification and file history, but it proceeds to rely heavily on extrinsic evidence, such as the testimony of inventors about products they built or generalizations about products being offered by NetRatings or its parent companies, all of which are irrelevant to claim construction.  WebSideStory makes many additional errors, such as consistently merging claims in violation of the doctrine of claim differentiation, rendering express claim language superfluous, and using dictionaries that are not taken from the proper time frame and are inconsistent with, if not outright contradictory to, the majority of other dictionary sources.  All of these tactics violate well-established legal principles and have been much admonished by the Federal Circuit.

---

[1]  The asserted patents are U.S. Patent Nos: 5,675,510 (the "'510 patent"); 6,115,680 (the "'680 patent"); 6,138,155 (the "'155 patent"); 6,763,386 (the "'386 patent"); and 6,108,637 (the "'637 patent").  Each asserted patent is annexed as Exhibits A-E to the Joint Appendix of Exhibits being filed herewith (hereinafter references to the Joint Appendix will follow the form: "JA Ex. __, p. __").

Moreover, WebSideStory's arguments often do not support their proffered claim construction.  Rather, WebSideStory employs specification citations in purported support of its constructions but then often does not show how such citations, even assuming they should somehow be read as limitations on the claims, result in the specific limitations in WebSideStory's constructions.  It appears WebSideStory is attempting to slip many limitations past the Court through such smoke screens.

Making matters worse is that many of WebSideStory's limitations introduce inappropriate relative terminology to WebSideStory's proposed constructions, particularly time-based limitations (*e.g.,* "permanent," "previously stored," "later use," "over time", *etc.*) which are themselves vague. Not surprisingly, WebSideStory's brief provides little or no guidance as to how the Court or a jury will determine when its proposed relative concepts have been met, leaving WebSideStory free to argue the infamous "we'll know it when we see it" theory of law.

Finally, WebSideStory asks the Court to determine, prematurely and without anything resembling a proper, much less adequate, record of factual or expert evidence, which claim elements are purportedly invalid for being indefinite or non-enabled.

As explained in NetRatings' opening claim construction brief and further below, it is NetRatings' constructions, and not WebSideStory's, which are consistent with established legal principles and should be adopted by the Court.

## POINT I

### WEBSIDESTORY'S REPEATED AND UNSUPPORTED ATTEMPTS TO READ LIMITATIONS FROM THE SPECIFICATION INTO THE CLAIMS SHOULD BE REJECTED

One of the fundamental precepts of claim construction and, indeed, patent law, is that it is the claims which delineate the scope of the invention, not examples of embodiments disclosed in

the specification.  As stated by the court in *Lighting World, Inc. v. Birchwood Lighting, Inc.*, "the scope of the claims [are] not limited to particular embodiments depicted in the figures or described in the written specification."  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004).  *See also Playtex Prods., Inc. v. Procter & Gamble Company*, 400 F.3d 901, 906 (Fed. Cir. 2005) ("the claims, not the specification embodiments, define the scope of protection."); *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (1997) ("it is the claim that defines the invention and gives notice to the public of the limits of the patent monopoly"); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) ("claim define[s] the scope of a patent grant.").

In contrast, WebSideStory's approach in supporting its narrow claim constructions is to immediately jump into embodiments in the specification and declare them to be requirements of the claims.  WebSideStory repeatedly refers to the specifications of the asserted patents as mandating or requiring its limitations on the claims, of establishing what claim terms must consist of, or as being the only source from which to draw their definition.  *See, e.g.,* WSS Br. at 12-19, 25, 26, 29, 30, 39, 41-44, 47, 49.  However, specifications do not impose requirements.  Rather, specifications provide guidance to understanding, an "aid" in ascertaining meaning.  Indeed, as the Federal Circuit reiterated in the *Phillips* case, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude' . . . 'we look to the words of the claims themselves  . . . to define the scope of the patented invention.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).

What WebSideStory is attempting to do is not as the Federal Circuit directed in *Phillips* -- to understand the claim language based on the specification -- but what the Federal Circuit in *Phillips* directed Courts **not** to do: read embodiments onto the claims in a limiting manner.

3

*Phillips*, 415 F.3d at 1323.  *See also Playtex Prods.*, 400 F.3d at 907 (Federal Circuit noting that in "its reliance on the figures, the district court improperly limited [the claim at issue] to a preferred embodiment"); *Home Diagnostics, Inc., v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."); *RF Delaware, Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003) (claim terms expressed in general descriptive words will not be limited to specific details in specification or narrower claims); *Beckson Marine v. NFM, Inc.*, 292 F.3d 718, 724 (Fed. Cir. 2002) (the "court does not construe the figures depicting a single preferred embodiment as limiting the claim terms in light of other language in the written description embracing other…structures.").

## POINT II

## <u>WEBSIDESTORY'S USE OF EXTRINSIC EVIDENCE IS IMPROPER</u>

### A.    WebSideStory's Use of Inventor Testimony Should Be Disregarded

Throughout its brief, WebSideStory cites to various statements of inventors, taken out of context, to purportedly support its claim construction positions.  Putting aside that such testimony does not actually support WebSideStory's positions,[2] WebSideStory's reliance on such testimony flies in the face of the law governing claim construction.

An "inventor's subjective intent as to claim scope, when unexpressed in the patent documents," should have no effect on claim construction.  *Vitronics Corp. v. Conceptronic, Inc.*,

---

[2]  By way of example, WebSideStory often cites to inventor testimony in purported support of its interpretation of the patent, and implying that the inventor testimony is actually about the patent, when in fact, the inventor is testifying as to what a specific, actual product did.  *See, e.g.,* WSS Br. at 7 and 11 (purporting to describe the invention and citing to testimony of two inventors of the '510 and '680 patents, where the inventors were actually discussing the product they created -- not opining on what the patent meant).  *See also* WSS Br. at 13, n. 8 (arguing regarding what the "events" of the patent are, but citing to testimony of inventors that is not about the patent, but rather about actual products and, in one case, statements made in a memorandum).

90 F.3d 1576, 1584 (Fed. Cir. 1996).  *See also Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000) ("[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)").  Indeed, this is the principle of law established by the seminal case on claim construction, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983, 986 (Fed. Cir. 1995) ("the testimony of Markman and his patent attorney on the proper construction of the claims is entitled to no deference. . . ."; "This does not mean there is never a need for extrinsic evidence in a patent infringement suit.  A judge is not usually a person conversant in the particular technical art involved and is not the hypothetical person skilled in the art to whom a patent is addressed.  Extrinsic evidence, therefore, may be necessary to inform the court about the language in which the patent is written.  ***But this evidence is not for the purpose of clarifying ambiguity in claim terminology.***") (emphasis supplied).

If anything, this aspect of Markman has only been reinforced by the Federal Circuit's most recent iteration of the law governing claim construction.  As clearly stated by *Phillips*, the primary focus of the Court in construing claims should be on the intrinsic evidence.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318.  *See also Akamai Techs., Inc. v. Cable & Wireless Internet Services, Inc*., 344 F.3d 1186, 1194 (Fed. Cir. 2003) (rejecting use of inventor testimony to inform as to the meaning of claim terms; what patentee subjectively intends irrelevant); *Dow Chemical Co. v. United States*, 226 F.3d 1334, 1341 (Fed. Cir. 2000) (holding that district court erred by relying on testimony of inventor and other witnesses rather than the intrinsic record to construe claims).

Accordingly, WebSideStory's arguments using inventor testimony to limit or narrow the scope of the claims at issue should be disregarded.  *See, e.g.,* WSS Br. at 9, 11, 13 and 45.

**B.    Actual Products Have No Bearing on Construction of the Asserted Patents**

In addition to the improper use of extrinsic evidence through the use of inventor testimony, and sometimes in conjunction with such testimony, WebSideStory commits blatant error in attempting to support its constructions by reference to actual products.  For example, WebSideStory engages in a discussion of its product offerings as compared to those it claims are being offered by NetRatings, as if this discussion had any bearing on the question of how to construe claim terms in patents.  WSS Br. at 2-4.  As another example, WebSideStory attempts to support its construction of "storing" in the context of the '510 and '680 patents with testimony regarding what actual software created by the inventors of those patents did.  *See* WSS Br. at 14, n. 10.  The law is clear that claims are construed in light of the claim language, specification and prosecution history, "*not in light of the accused device*."  *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1408 (Fed. Cir. 2004) (citing *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (emphasis in original).  This maxim is often repeated in the context of admonitions against plaintiffs who try to construe claims in light of accused devices, but is no less applicable to defendants who attempt to use products or similar extrinsic evidence to construe the claims.  Accordingly, WebSideStory's references to actual products should be completely disregarded.

## POINT III

**WEBSIDESTORY'S INDEFINITENESS ARGUMENTS
SHOULD NOT BE CONSIDERED DURING THE
CLAIM CONSTRUCTION PHASE OF THIS CASE**

For several different terms of the asserted patents, WebSideStory contends that the terms are indefinite.  Likely knowing that determinations of validity are generally considered inappropriate during claim construction, WebSideStory proffers that "[a] determination of

indefiniteness is not only appropriate during claim construction, but is necessitated by the Court's

performance of its duties to construe claims under 35 U.S.C. § 112, ¶ 6." WSS Br. at 17, n. 14.

WebSideStory then cites to two cases in support of this statement; however, as discussed below,

those cases do not actually stand for the proposition asserted by WebSideStory. Moreover, more

recent authority and case law which is directly on point refute WebSideStory's position and

confirm that it is inappropriate to make validity determinations during claim construction.

In the recent *Phillips* case, the Federal Circuit made it clear that validity analyses, such as

in construing a claim term to preserve validity, should only be performed after "applying all

available tools of claim construction" and then determining "that the claim is still ambiguous."

*Phillips*, 415 F.3d at 1327. *See also Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1376

(Fed. Cir. 2005), *quoting Phillips* (same). The *Phillips* Court stated:

> While we have acknowledged the maxim that claims should be construed to
> preserve their validity, we have not applied that principle broadly, **and we have
> certainly not endorsed a regime in which validity analysis is a regular component
> of claim construction**. Instead, we have limited the maxim to cases in which the
> court concludes, after applying all the available tools of claim construction, that the
> claim is still ambiguous. In such cases, we have looked to whether it is reasonable
> to infer that the PTO would not have issued an invalid patent, and that the
> ambiguity in the claim language should therefore be resolved in a manner that
> would preserve the patent's validity.

*Phillips*, 415 F.3d at 1327 (emphasis supplied).

In another case, *StairMaster Sports/Medical Prods. v. Groupe Procycle*, the District Court

of Delaware was presented with arguments like those made by WebSideStory. *StairMaster*

*Sports/Medical Prods. v. Groupe Procycle, Inc.*, Case No. 97-396 MMS, 1998 WL 290296 (D.

Del. May 20, 1998). The Court, in rejecting the defendant's arguments, noted that the "[t]he

Federal Circuit Court of Appeals . . . has consistently rejected this approach to claim construction

and continues to draw a line between claim construction issues and issues of infringement and

invalidity." *StairMaster*, 1998 WL 290296, at *2 n.5. The Court further noted that "[a]mbiguity,

undue breadth, vagueness and triviality are matters which go to claim validity for failure to comply with 35 U.S.C. § 112, P2, not to interpretation of construction." *Id.* Thus, not only does precedent discourage validity determinations during claim construction, but where that course may be departed from, it is with the aim of upholding validity, not the other way around as WebSideStory would have this Court do.

Nor do the cases relied on by WebSideStory support its position. For instance, WebSideStory quotes *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999) as stating "an analysis under § 112, ¶ 2 is inextricably intertwined with claim construction."). Yet, what the *Atmel* Court was referring to was why the Federal Circuit should have *de novo* review of the decision below, because the validity issue was like claim construction in so far as it being a matter of law for the Court. *Atmel*, 198 F.3d at 1378. The quoted language was not directed to the issue of whether it was proper to rule on indefiniteness during claim construction. Similarly inapt is WebSideStory's citation to the statement made in *Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998), that "[a] determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duties as the construer of patent claims." In the *Personalized Media* case, the Court was explaining how the test for indefiniteness is similar to that used in claim construction, that is, what the understanding of one of ordinary skill in the art would have been. Again, however, the Court was not making a statement as to the propriety of ruling on validity during claim construction. In fact, in *Personalized Media*, as in *Atmel,* the validity issue was resolved *after* construction of the claim terms at issue. *Atmel*, 198 F.3d at 1377; *Personalized Media*, 161 F.3d at 705. Indeed, both cases involved final dispositions on the merits and thus the courts were determining ultimate issues of infringement and invalidity. *Atmel*, 198 F.3d at 1375-76 (appeal

8

from decision on summary judgment motion of invalidity where district court decided that it would be efficient to "construe the claims before ruling on validity"); *Personalized Media*, 161 F.3d at 697 (appeal from final determination of International Trade Commission regarding infringement and invalidity).

Accordingly, WebSideStory's improper attempt to have this Court rule on validity issues now, during claim construction, should be rejected.

## POINT IV

## SPECIFIC TERMS FROM THE ASSERTED PATENTS

**A.     Terms From the '510 and '680 Patents**

**1.     *local computer use meter/user meter***

In its opening claim construction brief, NetRatings pointed out that WebSideStory's proposed construction of this term was incorrect because it requires (1) that the meter run "independently" from other software programs, and (2) that the meter collects information only about other software programs "running on that personal computer."[3]  WebSideStory's purported justifications for these limitations only reinforce that they are incorrect.  For example, in support of its added limitation that the meter run "independently" from other software programs, WebSideStory cites not a single reference to such independent operation from any evidence, be it intrinsic or extrinsic.  Rather, WebSideStory cites to alleged support from the specification that the meter is a "stand-alone program" and that it runs "within its own window."  WSS Br. at 9-10. WebSideStory equates each of these limitations (through the use of the notation *i.e.*) with "operating independently," thus reinforcing the concerns expressed in NetRatings' brief that the

---

[3] Hereinafter references to the Parties' Joint Claim Construction Chart, submitted herewith, will follow the form: "JCCC ___."

phrase "operating independently" does not have sufficient meaning on its own and is vague.  In essence, WebSideStory is attempting to slip the phrase "operate independently from other programs" into its definition behind the smoke screen provided by these other concepts.

Moreover, WebSideStory's purported support for these two other concepts does not hold up.  The cited specification support is explicitly characterized in the '510 and '680 patents only as *embodiments* of the invention, and not as the invention itself as claimed.[4]  *See, e.g.,* '510 patent, col. 4, l. 67 (describing Fig. 2 as an "embodiment"); col. 9, ll. 36-38 (describing the automatic minimization of the computer use meter as "an advantageous embodiment").  Clearly, details from specific embodiments described in the specification are not to be imported into claims as limitations.  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004).  Furthermore, the meter surely could not accurately be characterized as operating "independently" of the Windows operating system, if the specification describes ways in which the meter monitors messages or commands of this operating system.  *See, e.g.* col. 6, ll. 21-29.  The reference to the meter as being or having "modules" does not have any bearing on whether it must operate "independently" of other programs.[5]

As to the second incorrect limitation identified above, that the meter as claimed collects information only on other programs "running on the personal computer," WebSideStory disingenuously sweeps it under the rug by stating that the parties are in agreement as to this.  We

---

[4]  Part of WebSideStory's rationale for resorting to the specification to limit this term is its conclusory statement, without any support, that the entire phrase "local computer use meter" is not a term of art.  Whether WebSideStory is referring to the phrase as a whole or components thereof is entirely unclear.  As shown in NetRatings' brief, however, the components of this phrase would be understood by those skilled in the art, as would the phrase as a whole, without the need to resort to the specification.  Indeed, under WebSideStory's apparent logic, it could be argued that any long claim phrase that results from combining words or terms would not, in and of itself, be a term of art.

[5]  *See, e.g., McGraw-Hill Dictionary of Scientific and Technical Terms* (Sybil P. Parker ed., 5th Ed. 1994) ("*McGraw-Hill*") at A078 [module] (Ex. 10 to the Declaration of Karine Louis executed on Oct. 27, 2006, hereinafter "Louis Decl. Ex. __"); *Microsoft Press Computer Dictionary* (3rd Ed. 1997) ("*Microsoft*") at A081 [module] (Louis Decl. Ex. 11).

most certainly are not.  The addition of the concept of "running" is superfluous and vague, given

that the claim and both parties' definitions already say that the meter collects information about

the "use" of other software programs and that, moreover, WebSideStory's construction introduces

the yet additional related concept of programs "operating."  It is not a given that a program must

be presently "running" in order for a meter to collect information about its "use," which is all the

claim requires.  WebSideStory's brief provides absolutely no support for the "running" limitation.

> **2.**      ***installed in user computer machines***

In its brief, WebSideStory attempts to support its construction by arguing that the term

requires that "**someone** place the local computer use meter **somewhere**."  WSS Br. at 10.  In

doing so, however, WebSideStory makes it plain that its construction and its argument diverge

from the well-settled principle of claim construction, as explained above at __, that it is the claims

which delineate the scope of the invention, not examples of embodiments disclosed in the

specification.

Accordingly, "installed in user computer machines" should neither be limited to

embodiments illustrated in the Figures or described in the specification.  In this case, nothing in

the claims (or the specification) requires that the meter have been installed by a specific someone

or something (*e.g.,* a person or a computer) for that matter, nor in a specific manner.  Indeed, the

specification clearly contemplates, in some embodiments, the use of "***automated*** installation and

data transfer programs" through which the system can "maintain as passive a profile as possible"

and which "reduce impact on any particular user." Col. 4, ll. 55-63; see also Col. 3, lines 13-15

(software upgrades to the data transfer program may automatically be transferred to the panelist's

computer).  To support the added limitation that *someone* must have installed the meter,

WebSideStory imports the concept of a panelist from the specification.  WSS Br. at 10.  However,

the concept of a panelist is conspicuously absent from the claims, as is any specific actor being required by the claims.

In this case, the claims themselves provide more than enough guidance to interpret and construe this term. *See Phillips,* 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms"). The claim, and indeed, the term in dispute, specifies that the meter is installed "in user computer machines." That is the somewhere -- nothing more -- and there is nothing ambiguous or hard to understand about it. Indeed, even the specification never states that the meter must be installed in any particular part of a computer machine, much less in its "permanent program storage" as WebSideStory would have the Court require. WebSideStory attempts to divine such a limitation from the specification by citing references in the specification to embodiments in which the meter is updated or minimized. WSS BR. at 11. However, given that embodiments in the specification are not to be used to import limitations into the claims, as explained above, this use of *properties* of certain embodiments to glean further, unspecified properties of the embodiments to then limit the claims to those unspecified properties is ludicrous.

### 3. *log of predetermined [machine operation] events; log*

WebSideStory states "[t]he specification of the Coffey Patents establishes that the log must consist of three elements." WSS Br. at 12 (emphasis supplied). For reasons explained above, *supra* at Point I, this over-reliance on embodiments in the specification to determine what the claims must consist of is a fatal error.

Moreover, WebSideStory's conclusions regarding what the specification discloses regarding the log are incorrect in any event. For instance, WebSideStory argues that the log must be a "file" because the specification refers to a "log **file**." WSS Br. at 12. But the specification also refers to the log without use of the word "file." *See, e.g.,* '510 patent, col. 2, l. 54 (referring

to the "data log" and a "log" with no qualifier); col. 2, ll. 58 and 59 (referring to an "event log");

col. 2, l. 64 (referring to "local personal computer use logs").[6]

      With respect to WebSideStory's assertion that the log "must be generated by something,"

the position is refuted by the claims themselves.  For instance, claim 1 of the '510 patent specifies

that the meters "includ[e] a log" whereas claim 10 of the patent specifics "creating" a log and

claim 11 specifies "generating a log."  Thus, as an initial matter, not all of the claims require

creation or generation of the log, nor should they be read in a manner which would render

language in some claims superfluous.  *See, e.g., Dow Chemical Co. v. United States*, 226 F.3d

1334, 1341 ("The doctrine of claim differentiation . . . creates a rebuttable presumption that each

claim in a patent has a different scope.").  *See also AT & T Corp. v. Microsoft Corp.*, No. 01 Civ.

4872 (WHP), 2003 WL 21459573, at *7 (S.D.N.Y. Jun. 24, 2003) (declining to use claim

construction that would render claims identical in violation of the doctrine of claim

differentiation).  Further, none of the claims specify what 'something' does the creating or

generating.  WebSideStory cites to a section of the specification which states that the meter

"advantageously generates an event log" (WSS Br. at 12), but this is an embodiment, not a claim

---

[6] WebSideStory's reliance on Webopedia Computer Dictionary as supporting its construction of "log" is misplaced. See WSS Br. at 12. As an initial matter, the Webopedia reference is not contemporaneous with the patent.  The '510 patent was filed in June of 1995 and issued on October 7, 1997 while the Webopedia reference is dated Sept. 18, 2006 (*See* Ex. 3 to the Decl. of Oliver Bennett dated Sept. 27, 2006, hereinafter "Bennett Decl.").  *See Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1375 (Fed. Cir. 2005) ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."), *quoting Phillips*, 415 F.3d at 1313; *Canon Inc. v. GCC Intern. Ltd.*, No. 06 Civ. 3324(PKC), 2006 WL 2516568, at *2 (S.D.N.Y. Aug. 29, 2006) (same).  Further, references which were contemporaneous to the '510 patent actually support NetRatings' construction of "log" (as a "record" ) rather than WebSideStory's construction that a log must be a file.  See, e.g., *IBM Dictionary of Computing* (George McDaniel ed., 10th Ed. 1993) ("*IBM*") at A020 [log] (Ex. 3 to the Declaration of Arianna Frankl executed on Sept. 27, 2006, hereinafter "Frankl Decl. Ex. __"); *McGraw-Hill* at A053 [log] (Frankl Decl. Ex. 7); *Webster's II New College Dictionary* (1995) ("*Webster's II*") at A043 [log] (Frankl Decl. Ex. 6); *The Merriam-Webster Dictionary* (1997) ("*MW*") at A033 [log] (Frankl Decl. Ex. 5).See, e.g., *IBM* at A020 [log]; *McGraw-Hill* at A053 [log]; *Webster's II* at A043 [log]; *MW* at A033 [log].

limitation.  That is, while it is certainly possible and perhaps fair to assume that the log could be generated by the meter, *the claims do not require it*, which is all that counts.  Following WebSideStory's twisted logic, why not purport to "define" everything referenced in the claims, such as computer machines, a processing station, and the meter itself, as having been generated or creating by *someone* and kept *somewhere*.  However, these are not constructions of claim terms, but the mere introduction of various irrelevant facts about the terms.  Reading an embodiment in the specification into the claim terms  as WebSideStory proposes would clearly violate settled law.  *See, e.g., Phillips,* 415 F.3d at 1303 ("we have repeatedly warned against confining the claims to [specific] embodiments," and "we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"); *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (same); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905-906 (Fed. Cir. 2004) (same); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) (same).

For similar reasons, the Court should also reject WebSideStory's assertion that the log "must be capable of recording the occurrence of multiple events over a period of time in a time-sequential manner."  WSS Br. at 12.  WebSideStory first purports to rely on the plain meaning of log as a "record of events," but does not establish why and how that relatively straightforward plain meaning should be turned into the detailed recitation it seeks to have added to the claims. WebSideStory then purports to rely on a stated advantage of the system according to the invention.  However, its argument is simply disingenuous.  First, statements regarding advantageous features are not limitations on the claims.[7]  Second, the specification section

---

[7]  WebSideStory frequently cites language from the specification of the patent using the word "advantageous" or "advantageously" in support of its constructions to limit the scope of the invention.  *See,*

referenced by WebSideStory is referring to the *system* described in the patent, which includes, as

claimed, a processing station and database, which are described as being capable of taking a log

with an event as received from a meter and analyzing it to measure values such as total minutes of

use. *See, e.g.,* '510 patent, col. 5, ll. 28-63.  Third, the specification uses the capturing of date and

time as an *example* of the additional information that could be gathered.  *See, e.g.,* '510 patent,

col. 3, ll. 49-53.  Once again, WebSideStory is improperly asking the Court to import examples or

embodiments from the specification and make them requirements of the claims.

    **4.**    ***stored in memory of said computer machines; stored in an associated user computer machine; storing each of the events in said log in the local computer memory of said user computer systems; storing said log of predetermined events by each use meter in an associated user computer machine***

In its brief, WebSideStory contends that the parties agree that the foregoing terms should

all be construed to mean the same thing.  This is incorrect.  Indeed, a primary problem with

WebSideStory's construction of these terms is that it does essentially equate the terms,

disregarding the plain language of the terms which indicates their differences.  WebSideStory

does this in order to support its errant narrowing construction which requires that the log be stored

in a very specific place within a computer.  When one actually considers the language in each of

these terms, it becomes clear that WebSideStory's interpretation cannot be correct and that the

patent contemplates storage in a variety of locations, in some cases specifying a particular location

within a computer and in other instances not:

    stored **in memory of said computer machines** ('510 patent, cl. 1);

    stored **in an associated user computer machine** ('680 patent, cl. 1);

---

*e .g.,* WSS Br. at 10, 12, 15, 18.  However, WebSideStory's reliance on such sections to limit the claims is incorrect.  *See Dow Chemical Co. v. Astro-Valcour, Inc*. 47 F. Supp. 2d 294, 299 (N.D.N.Y. 1999) (improper to read advantages from the specification into the claims) and *Brookhill-Wilk, LLC. v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1301 (Fed. Cir. 2003) (advantages from specification if not included in claims are not per se limitations).

> storing each of the events in said log **in the local computer memory of said user computer systems** ('510 patent, cl. 11);
>
> storing said log of predetermined events by each use meter **in an associated user computer machine** ('680 patent, cl. 12).

Thus, in the terms above from the '510 patent, the claim language specifies storage "in memory" in claim 1, and in "local computer memory" in claim 11, thereby drawing a distinction between memory types.  These terms are further distinct from the terms in the '680 patent, neither of which include reference to "memory" at all, but simply specify storage in "an associated user computer machine."  To adopt WebSideStory's constructions for these terms would be to read these distinctions right out of the claims, in clear violation of well established claim construction principles regarding claim differentiation.  *See Dow Chemical Co. v. United States*, 226 F.3d 1334, 1341.[8]

To the extent that WebSideStory is arguing that the storage must take place in a manner to allow for "later use" (WSS Br. at 14), the constructions it proffers go too far and are otherwise vague and not helpful.  If anything is required, it is only that which is necessary to permit the remainder of the claim elements to be effected.  Thus, the fact that the log or events from the log are transferred to a processing station, or are used in reporting, does not require that the log be stored in "permanent memory" or a "hard drive."  As explained in NetRatings' opening brief, there are other possibilities and neither the claims nor the specification require a particular one.

---

[8]  WebSideStory's constructions and arguments lack merit for other reasons as well.  For instance, WebSideStory draws a conclusion regarding what must purportedly be "necessary" based on an embodiment in the specification.  WSS Br. at 14 (concerning the "log flush operation").  Yet, WebSideStory offers no support for why its conclusion is accurate, and even if it were accurate, there is nothing in the intrinsic evidence which supports reading the embodiment into the claims.  *See, e.g., supra* Point I.  In other instances, WebSideStory inappropriately relies on inventor testimony in purported support of its claim construction.  WSS Br. at 14, n. 10.  *See supra* Point II.  In still other instances, WebSideStory simply draws conclusions regarding what the claims must mean without any support at all.  *See, e.g.,* WSS Br. at 15, n. 11 (stating, without explanation or support, that because logs are "'stored' at the central processing station" this is "clearly more than placing the log into transient memory").

16

*See* NetRatings Br. at 20-21.[9]  Moreover, WebSideStory's introduction of the relative concept of "later" use is vague and begs the question, to be answered we assume by the Court or jury, as to how much time "later" would satisfy this limitation WebSideStory is trying add.  Presumably, WebSideStory will just argue that whatever "later" means it does not include what its products do.  However, this is not how claim terms should be defined.

**5.** ***identify titles of open windows and reflects a log of titles of worldwide web pages; identify titles of windows and world wide web pages***

With respect to the foregoing terms, WebSideStory continues its erroneous approach to claim construction, glossing over the extremely detailed limitations it attempts to have written into the claim terms, adding qualifiers into the terms where no such qualifiers exist in the claims, relying on extrinsic evidence without any basis and mischaracterizing such evidence in any event, and importing example embodiments from the specification into the claims.  WebSideStory's approach and constructions should be rejected.[10]

For instance, WebSideStory contends that the "plain language of the claims" requires that the addition of the detailed limitations set forth in its constructions for these terms but, in fact, the claim language requires no such thing.  WebSideStory's unabashed attempt to narrow the claims is obvious when comparing WebSideStory's construction with the claim language itself.  Thus, in lieu of the claim language:

---

[9]  WebSideStory intermittently relies on an embodiment in the specification described in columns 7-8 in which a "log flush operation" is performed to write logs that "are still held in memory."  *See, e.g.,* WSS Br. at 14.  However, rather than establish that logs must therefore be stored in permanent memory such as a hard drive, it actually proves the opposite.  That is, this embodiment, in which the log is written from memory, is discussing a shut down operation in which the meter is going to close itself down.  *See* '510 patent, col. 7, l. 29 – col. 8, l. 2.  Short of a shut down operation, however, the log may be, and apparently would typically be, stored in any memory in the computer machine, including transient memory, which is all the claim requires.

[10]  WebSideStory again incorrectly asserts that the parties agree that these two terms should be construed as meaning the same thing.  The claim language of each term is different and NetRatings' construction appropriately accounts for this.  *See* NetRatings Br. at 21-23.

> titles of open windows

WebSideStory proposes:

> the **full** names of open windows **as they appear in the window's title bar,
> when the  window is displayed on the computer's display**,

and in lieu of the claim language:

> titles of world wide web pages

WebSideStory proposes:

> the **full** names of world wide web pages **that appear in the window's title
> bar, when those pages are displayed in a window on the computer's
> display**.

What support does WebSideStory point to for these wholesale additions to the claim

terms?  Extrinsic evidence in the form of inventor testimony.  Such use of extrinsic evidence is at

odds with a long line of legal precedent.  *See Markman*, 52 F.3d at 983, 986 (explaining how

extrinsic evidence may be used to assist the Court in understanding the technology at issue, but

not construing the terms themselves).  While there may well be instances when the claim language

at issue is of such a technical nature that review of extrinsic evidence is helpful to the Court in

understanding the technology, or perhaps in confirming the ordinary meaning of claim terms,

understanding what a "title" is does not seem to rise to that level, nor are WebSideStory's

additions to the claims supported by the ordinary meaning of the claim language.[11]

As in many other places, WebSideStory relies on inventor testimony as to what a specific

product may have done in support of its narrowing construction of this element.  WSS Br. at 15, n.

12.  However, it ignores the intrinsic evidence, which the courts have actually directed to be used

---

[11]  In fact, it appears that WebSideStory's constructions do not actually *construe* the claim terms.  In place
of the claim word "title," WebSideStory simply uses the word "name."  WebSideStory then proceeds to
add the long qualifiers highlighted above.  NetRatings, on the other hand, provides an actual construction
for the disputed terms which explains what the terms are, relying on the ordinary meaning of the claim
language which is amply supported by explicit statements in the specification as well as by the applicants
during prosecution.  *See* NetRatings Br. at 22.

as the only evidence of an inventor's intent.  That is, it ignores the statements in the prosecution history that illustrate what the inventors intended to have covered by the use of the term "titles" in the claims. NetRatings Br. at 22.

>    **6.**     *identifies character strings reflecting on-line activity*

In its brief, WebSideStory attempts to support its construction of this term -- which constitutes a wholesale importation of its own incorrect *characterization* of a specification embodiment -- by arguing that the applicants made representations during prosecution of the '680 patent that require WebSideStory's interpretation.  WebSideStory's arguments fall wide of the mark, both with respect to its characterization of the prosecution history and its characterization of the specification.

As an initial matter, using a notice of allowance to limit claim scope has been rejected by the Federal Circuit.  *Eolas Technologies Incorp. v. Microsoft Corp.,* 399 F.3d 1325, 1338 (Fed. Cir. 2005) (rejecting use of reasons for allowance to limit claim because "the applicant has 'no obligation to respond to an examiner's statement of Reasons for Allowance'").  Moreover, even considering the argument, what WebSideStory is suggesting, without any precedential support whatsoever, is that the reasons for allowance are equivalent to the claim language itself.  In other words, to adhere to WebSideStory's approach, the scope of every patent that issues would be defined by what the examiner states in its reason for allowance, if any.  This cannot be and is not an appropriate manner of interpreting claims -- the examiner allowed the language in the claims -- not the language in the specification.  And it is well settled that it is the claims which delineate the scope of the invention.  *See Phillips*, 415 F.3d at 1312.

Moreover, even if the Court accepts WebSideStory's argument (that the citation to specific sections of the specification shows that the term means what is described in those sections), WebSideStory's construction must still be rejected because it does not accurately reflect what is

described in the cited specification sections.  First, it should be understood that while the term at issue is "identifies character strings reflecting on-line activity," WebSideStory actually only provides a purported construction for the phrase "character strings reflecting on-line activity" as it simply reuses the word "identifies" in its construction.  Thus, when reviewing those sections of the specification, what is being interpreted is what the character strings are.  The specification section actually uses very simple language in describing the character strings.  They may be "strings of characters," "predetermined character strings," an "'http:' string," a "Universal Resource Locator (URL)," as well as "Window information," "Window titles," "useful descriptions of the activity at [the] moment."[12]  WebSideStory's construction is thus incorrect in not accounting for each of these examples, and in building in an asserted explanation of what the meter does with or to obtain the character strings.

### 7.     *correlates said titles to identifiable labels*

WebSideStory erroneously contends and argues in its brief that this term is indefinite.  As discussed above, WebSideStory's arguments of invalidity on the ground of indefiniteness should be rejected as being inappropriate for resolution in the context of *Markman* proceedings. However, should the Court consider WebSideStory's contention at this time, nothing that WebSideStory argues in its opening brief changes the fact that, as set forth in NetRatings' opening brief, the term has a straightforward and readily understandable meaning.  *See* NetRatings Br. at 25-26.

---

[12]  This fact -- that WebSideStory has proffered a construction comprising two possible meanings -- further illustrates why WebSideStory's construction should be rejected.  A more appropriate construction would be one which encompasses, at a minimum, both of the possible meanings that WebSideStory concedes are possible.  NetRatings' construction does exactly this -- provides a construction which encompasses both of the examples that WebSideStory identifies (as well as the others clearly shown by the claim language and the specification as being within the meaning of the term).

WebSideStory asserts that because the "specification is completely silent as to the scope and intended meaning of the claim element 'identifiable labels'" and because the term "identifiable labels" "never appears in the specification," the claim limitation is indefinite under 35 U.S.C. § 112.  WebSideStory's statements that the term does not appear in the specification are misleadingly inaccurate and its conclusion, in any event, not supported by the case law.  With respect to references in the specification to "identifiable labels," while the exact phrase is not written in the specification, the identification of labels and data for reporting is referred to multiple times.  *See* NetRatings Br. at 25-26, citing to examples of "identifiable labels" in the specification (*e.g.,* the label "T", which "identifies the Windows title of the application"), '510 patent, col. 9, ll. 41-45.

Further, even if a term does only appear in the claims, this does not make the term indefinite.  In *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, the court was presented with the issue of construing a term that appeared "only within the claims, not in the patent specification."  *Wilson Sporting Goods Company v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006).  The court found that even though there was "[n]othing in the specification, including the claims, [to indicate] explicitly or implicitly, that the inventor intended to impart a novel meaning" to the term at issue, the term was not indefinite.  *Id.*  The court concluded "that the ordinary and customary meaning attributed to [the] term by those of ordinary skill in [the] art at the time of the invention involve[d] little more than application of [its] widely accepted meaning."  *Id.*[13]  There is nothing unclear or ambiguous about the phrase "identifiable labels," and

---

[13]  *See also Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.,* 222 F. Supp. 2d 423, 564 (S.D.N.Y. 2002) (rejecting defendant's argument that two claims indefinite based on their absence from the specification, finding "[t]he fact that the [term] appears only in the claims of the patents carries no weight.  The examiner allowed the claims that include it to be issued and presumably was convinced that the claims were supported by the specification…").

thus even if the term is not recited verbatim in the specification, its ordinary meaning --
particularly in view of the specification and claims as a whole -- is clear and is reflected in the
construction provided by NetRatings.

      **8.**     ***events; machine operation events***

     In its brief, WebSideStory argues that the terms "machine operation events," and by
association, apparently, "events" are not 'terms of art' and thus do not have ordinary meanings
which would be understood by one of skill in the art.  This, according to WebSideStory,
purportedly justifies a limiting construction of each term based on examples from the
specification.  WebSideStory is just plain wrong.

     First, whether or not a term is "a term of art" is not dispositive of whether the construction
of the term should be limited to the specification.  As discussed above, there is a very clear
standard on when such limitations are appropriate, and this situation is not within that standard.
Further, the fact is that "events" does have a well understood meaning in the context of computer
technology, and in many other contexts.  Thus, it is a straightforward task in reviewing the
claimed "events," considering the intrinsic evidence and meaning as understood by those of skill
in the art -- which may be considered with reference to treatises and dictionaries -- and
interpreting the term.  This is what NetRatings' construction ("occurrences or actions detectable
by a computer") reflects.  *See, e.g.*, *IBM* at A017 [event] (Frankl Decl. Ex. 3).  *See also Microsoft*
at A063 [event], (Frankl Decl. Ex. 8); *MW* at A089 [event] (Louis Decl. Ex. 13); *Webster's II* at
A095 [event] (Louis Decl. Ex. 14).

     The term "machine operation events" is a term for which the meaning is clear from the
common understanding of each of the words in the phrase, as NetRatings' construction provides:
"events relating to operations performed on the computer."  Thus, the "machine" is a computer (a
computer is surely a kind of machine, and is what is described as being the operative machine in

all aspects of the '510 and '680 patents). *See also MW* at A090 (machine: "An electrical, electronic, or mechanical device for performing a task.") (Louis Decl. Ex. 13); *Webster's II* at A096 (machine: "A system or device, as a computer, that performs or helps in performing a human task.") (Louis Decl. Ex. 14); *McGraw Hill* at A076 and A077 (computer: "[COMPUT SCI] A device that receives, processes, and presents data . . . Also known as computing machine."; machine: "[COMPUT SCI] A mechanical, electric, or electronic device, such as a computer, tabulator, sorter, or collator.") (Louis Decl. Ex. 10). Both "operation" and "events" (discussed above) carry their ordinary meaning and do not require construction. *See, e.g., MW* at A091 (operation: "method or manner of functioning") (Louis Decl. Ex. 13); *IBM* at A085 (machine operation: "An elementary function that a computer performs in response to a machine instruction. Synonymous with computer operation.") (Louis Decl. Ex. 12). *See also IBM* at A084, A086 (computer operation; operation).

**B.    Terms From the '155 and '386 Patents**

   **1.    *resource; resource use data***

   With respect to the term "resource," WebSideStory argues in its brief that its construction allows for both the concept of a resource as a collection of content as well as a resource as an individual component of the collection. However, WebSideStory's argument contradicts its actual construction, which includes a restrictive limitation that a resource "includes all embedded components that are necessarily displayed in order to display the resource." There is no basis in the intrinsic evidence for such a limitation. NetRatings' construction on the other hand properly reflects the wide variety of forms a resource may take, as expressly stated in the specification. *See* NetRatings Br. at 27-28.

   In a similar, inappropriately limiting manner, WebSideStory argues that "resource use data" must be more than "just the raw data concerning a user's activities" but rather, WebSideStory

contends, must be data which involves "some type of calculation," hence its use of the word

"derives" rather than "describe."  WSS Br. at 45.  Once again, WebSideStory simply takes

examples from the specification and concludes that the claim term must include those examples.

Yet, in doing so, WebSideStory ignores, and proffers a construction which would exclude, other

embodiments which do not describe any type of calculation.  For example, the '155 and '386

patents describe sending data collected by the tracking program to a server or computer, where the

data is then stored, analyzed and/or used in creating profiles.  *See, e.g.,* '155 patent, col. 4, l. 60 -

col. 5, l. 7; '386 patent, col. 4, l. 65 - col. 5, l. 12 (server may "build historical profiles of individual

users" or "extract information about how much data was downloaded by a respective client, and

how long or how often specific files were displayed or in use by the client."); '155 patent, col., 9,

lines 18 - 22; '386 patent, col. 9, lines 21 - 26 (data sent "to another computer on the Internet for

storage and analysis."); '155 patent, col. 14, lines 45 - 51; '386 patent, col. 14, lines 49 - 55

(tracking program may monitor "which . . . links are selected;" this data may then be sent to be

"sorted and stored in the server database and may be analyzed manually or automatically.").  Thus,

resource use data may be information which describes use of the resource, or is derived therefrom

(which would then be encompassed by the word "describe").  WebSideStory's construction which

is limited to only certain embodiments described in the specification must be rejected.  *See supra*

Point I.

WebSideStory's construction is also impermissible in view of the principles of claim

differentiation, as demonstrated with reference to the dependent claims of the '155 patent.  The

dependent claims of the '155 patent describe "wherein the executable program computes..." or

"wherein the executable counts..."  *See, e.g.,* '155 Patent, claim 5, claim 15, claim 17, claim 28,

claim 37.  Accordingly, while the "resource use data" generated by the tracking program  may

include calculated data, the presence of computational language in the dependent claims prohibits limiting the construction of the term as WebSideStory asserts. *See Kim v. ConAgra Foods, Inc.*, Nos. 05-1414, 05-1420, 2006 WL 2773237, at *11 (Fed. Cir. Sept. 20, 2006) ("the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.") *citing Phillips,* 415 F.3d at 1315.

For the foregoing reasons, WebSideStory's erroneous constructions of "resource" and "resource use data" should be rejected, and NetRatings' constructions adopted by the Court.

     **2.**     ***tracking program; executable program***

In perhaps the most egregious example of WebSideStory's improper approach to construing claim language, WebSideStory explains in its brief that its construction would read at least three distinct limitations into the claim term "executable program."  WebSideStory's arguments are incorrect and its construction should be rejected.

WebSideStory contends the executable program must be "a compiled" program (WSS Br. at 39), but WebSideStory's purported support for its contention is illusory and misleading.  For instance, WebSideStory cites to the Microsoft Computer Dictionary's definition for "executable program," *but omits entirely the portion of the definition which iterates precisely what NetRatings' proposes as its construction.  See Microsoft* at A061 (executable program is a "program that can be run") (Frankl Decl. Ex. 8). As another example, WebSideStory cites to the fact that Java is the language in which the embodiments in the '155 and '386 patents are described, and that programs written in Java are compiled.  However, WebSideStory does not, and indeed cannot, cite to a single reference in the specification regarding any step of compiling any programs or the need or desirability therefor or for using only compiled languages.  Rather, WebSideStory is again performing its multi-layered extrapolation of unspecified properties of embodiments and making them claim requirements.  Moreover, other programming languages

such as Javascript, which WebSideStory admits is not compiled (WSS Br. at 21, n. 15), are also consistently referred to, *including by WebSideStory itself* when it is not putting forth self-serving litigation positions, as being "executed" by the browser. *See* Press Release entitled "Cookie Rejection Less Than 1 Percent on the Web According to WebSideStory" (http://www.websidestory.com/company/news-events/press-releases/2001-04-03.html), at A098 (Louis Decl. Ex. 15); Press Release entitled "Media Advisory: Robots Inflate Web Site Traffic Figures" (http://www.websidestory.com/company/news-events/press-releases/2001-09-19.html), at A099 (Louis Decl. Ex. 16).  Clearly, programs which are not compiled are understood to nevertheless be "executable," and WebSideStory's attempt to add this extra requirement into the claims is overreaching and disingenuous.

WebSideStory also contends that the "executable program" must operate "independently of a browser."  WSS Br. at 39.  However, WebSideStory admits in its brief that the specification describes embodiments wherein the executable program operates independent of, as well as with, other software.  WSS Br. at 41.  It then says that since the "executable program *can be* a separate software program, it *must therefore* be capable of operating independently of a browser."  *Id.* (emphasis supplied).  The logic here is classically bad; all one could possibly conclude from these embodiments is that the executable programs described in the specification can be -- but need not be -- capable of operating independently of a browser.  Indeed, the specification is replete with embodiments in which a Java applet or ActiveX control is designed to operate within the browser, to thereby monitor use of resources accessed through the browser.  *See, e.g.,* '155 patent, col. 8, ll. 12-27.

Finally, WebSideStory argues that the executable program "must record data over the duration of time that the resource is displayed to the user, as opposed to at a single discrete point

26

in time."  WSS Br. at 41.  WebSideStory argues that this limitation is required based on claim language which states that the executable program "monitor **use** of the resource."  *Id.*  While WebSideStory attempts to justify its construction focusing on the word "use," it fails to provide any definitional support or even explanation for why "use" should be interpreted as occurring over time.  Indeed, the plain meaning of the word requires no such thing.  *See, e.g., MW* at A092 [use] (Louis Decl. Ex. 13); *Webster's II* at A097 [use] (Louis Decl. Ex. 14).

WebSideStory also tries to support this extraneous limitation with reference to the prosecution history of the '952 patent, the parent to the '155 patent, and the attorney's statement therein regarding "persistent cookies" which can only be "set" at a single point in time.  WSS Br. at 42.  WebSideStory's reliance is misplaced however as, putting all other issues aside, the statement concerned how and what data was collected, not when, and additionally was not with respect to the specific term at issue at all.[14]  Moreover, the claims of the '952 patent (which were being argued for in this prosecution history excerpt) include a "timer," which the claims of the '155 and '386 patent do not have.  Under claim differentiation, therefore, the claims of the '155 and '386 patent do not and should not be construed as also requiring such timer elements.  *See Tandon Corp. v. U.S. Intern. Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").

In its brief, WebSideStory purportedly concedes that the term "tracking program" is presumptively different than "executable program," yet WebSideStory still improperly attempts to place the same and additional limitations on the claim term.  With respect to those limitations (such as that the program must operate independently of a browser and must execute throughout the display of a resource), WebSideStory's construction is wrong for the same reasons as with respect to

---

[14]  For this reason, WebSideStory's reliance on *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291 (Fed. Cir. 1999) is inapt.

its construction of executable program.  *Supra* at 25-27.  With respect to the limitation added by WebSideStory, that the program generate information regarding the use of multiple resources, WebSideStory argues that this addition is proper because it is already "expressly" stated in the claims.  If the language is elsewhere in the claims already, adding it to the construction of this term does nothing more than increase the difficulty a jury will have in assessing infringement later.

With respect to WebSideStory's argument and construction which require that the tracking program always determine an amount of time a user has spent using a resource, WebSideStory offers no support for including this limitation.  In fact, while WebSideStory cites to the specification's reference to a timer, WebSideStory acknowledges that there are other embodiments in the specification.[15]  WSS Br. at 47.  Accordingly, WebSideStory's case law citations on this point are inapposite -- those cases addressed patents where there was only one embodiment described and the specification was explicit as to the issue and, for a long list of other reasons not applicable here, the Courts in those cases found it appropriate to limit the claims.  *See, e.g., Honeywell Int'l, Inc. v. IIT Indus., Inc.,* 452 F.3d 1312, 1318 (Fed. Cir. 2006) (element was not just preferred embodiment, it was the only embodiment); *SciMed Life Sys., Inc. v. Advance Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343 (Fed. Cir. 2001).

### 3.    *executable program not being part of the resource*

WebSideStory proposes a particularly extreme and absolute construction of this term, but, in a massive disconnect, its brief is barely arguing for the construction.  For example, the brief contains no explanation as to why it must be the case that "the entire instructions constituting the executable program" be "located in a file," or why this file must be "separate from" another file, or why this

---

[15]  In addition, as explained above, *supra* at 13, the doctrine of claim differentiation requires that the claims of the '155 and '386 patents, which do not contain a "software timer," be construed differently than the claims of the related '952 patent, which do contain such timers.

file must specifically be separate from "any file that contains content that is displayed as part of the resource." All WebSideStory's brief seems to support is that the executable program not be the part of the resource that displays the resource. WSS Br. at 43. Moreover, one of the examples cited by WebSideStory of an "executable program not being part of a resource" is a timer program which does not display anything but which could be contained within the resource or not contained within the resource and thus accessed, for example, through a reference in the resource. Per NetRatings' significantly more sensible construction, the proper construction of this element is of an executable program which is not contained within the resource.

   **4.**     ***monitor use of the resource; monitoring input device events;***
           ***monitoring details of choices made by a user of the first client***
           ***using an input device of the first client***

   NetRatings addressed WebSideStory's errant constructions of these terms in its opening brief. NetRatings Br. at 30-32. Among other issues, WebSideStory provides no justification for its limiting of the terms to encompass only tracking, rather than other types of monitoring, and to requiring the monitoring be performed over a specific time frame. NetRatings Br. at 32 (monitoring may include but does not require a time element; monitoring may be accomplished through tracking and a variety of other methods).[16]

   With respect to "monitor use of the resource," WebSideStory incorporates an additional limitation that the resource can only be monitored ***after*** it is downloaded. WebSideStory's only purported support for this is a citation to a general statement as to one of many objects of the invention, "to provide a method for tracking the use and interaction of a user with a resource downloaded from a server." WSS Br. at 42. But this reference does not support limiting the

---

[16] With respect to the 'over time' aspect of WebSideStory's construction, WebSideStory makes the same incorrect argument here as it does for executable program, that the program must monitor and record data over time to create a profile of use. *See supra* at 25-28. While certain dependent claims suggest the generating of profiles, the fact that those dependent claims exist raises a presumption that the independent claim does not contain such limitations. *See supra* at 13; '155 patent, claims 18 and 19.

claim to a specific embodiment, much less limiting the claim with the absolute and concocted qualifier that the resource must be *fully* downloaded.  Indeed, the patent specifically contemplates that resources may be comprised of components, which may be other resources (such as in a Web page), so that portions of a resource may be downloaded, other portions may not and monitoring of some or all of the resource may occur.  *See, e.g.,* '155 patent, col. 13, ll. 47-48 (time spent with a *portion* of a web page is monitored).

### 5. *client identifying indicia*

In its brief, WebSideStory argues that the term "client identifying indicia" is limited to only certain examples described in the specification.  WebSideStory's proposed construction is wrong not only because it unnecessarily limits the claim to embodiments from the specification (*see supra* at Point I), but it is also incorrect in its identification of what is disclosed in the specification.  Specifically, WebSideStory omits to discuss how the sections of the specification it cites state that the examples are just that, using terminology like "[o]ther available client information, *such as* the network ID and client ID . . . is also sent to the server."  '155 patent, col. 9, ll. 39-40 (emphasis supplied).  *See also* '155 patent (explaining that a script "may obtain . . . client identifying indicia transmitted by the client, *such as* in the HTTP request header," col. 15, ll. 52-55, and that such information includes "browser type" in addition to the examples noted by WebSideStory, col. 11, ll. 59-61).[17]

---

[17]  WebSideStory's erroneous conclusion may be the result of its apparent view that the client identifying indicia must be a "unique identifier for an individual client."  WSS Br. at 44.  But nowhere in the specification or intrinsic evidence is anything close to such a limitation described or suggested.  Indeed, only once in the '155 patent is the word "unique" used, and it is not in the context of discussing client identifying indicia or the information collected by the executable program.  *See* '155 patent, col. 1, ll. 35-39 ("The techniques utilized in many private networks for monitoring client use and interaction do not lend themselves to public networks. For example, user access to a server in private networks is generally obtained through the use of a unique identification number provided by the server.").  Moreover, the fact that the specification does recognize that a user may have a "unique identification number" but no such language is included in the specification discussion regarding client identifying indicia or in the claims,

6. ***the choices being associated with at least one of the first resource and the one or more second resources; monitor interaction through the client computer with at least one of the first resource and one or more second resources***

In its constructions of these terms, WebSideStory continues its improper adding of limitations, such as the addition of time elements to their constructions. *See supra* at Point I. WebSideStory also contends that that the monitoring must be with respect to interaction with ***multiple resources***. WSS Br. at 47. WebSideStory's error is illustrated by the very specification section they cite as purported support, which section states: "In addition, while it is currently possible to track a user's links within the ***same*** resource, there is no standard way to track user's links across ***multiple*** resources on different servers." '386 patent, col. 3, ll. 4-14 (emphasis supplied). As this section quoted by WebSideStory makes clear, a parallel is being drawn between the same resource and resources which are different from one another, or more than one -- not that the monitoring be performed on multiple resources at the same time.

7. ***storing resource use data associated with the monitored interaction***; ***storing the resource use data in the client computer***

In its brief, WebSideStory makes clear that its constructions of these terms are designed to impose a time element on the claims, even though no such timing limitation is within the claims or required by the intrinsic evidence. *See* WSS Br. at 48. WebSideStory's arguments in support of this extraneous limitation are without merit. For instance, WebSideStory states that because the claims contain separate steps of "storing" and "communicating" that there must be a purpose oriented relationship between the two elements, and a specific ordering. Yet there is nothing in the claims which requires or even suggests these limitations. Indeed, the claim elements discussed (storing and communicating) may well be performed *at the same time*. *See* '386 patent, claim 1.

---

reinforces that no such limitation was intended nor should it be included now as WebSideStory's construction would apparently require.

*See also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001)

(unless method steps actually recite a specific order, they are not construed to require one).

**C.      Terms From the '637 Patent[18]**

> **1.      *WebSideStory's Erroneous Arguments Regarding the
> Java Applet of the '637 Patent Should be Rejected***

In its brief, WebSideStory takes certain positions relating to a Java applet described in the

'637 patent in an effort to muster support for its inaccurate and unduly narrow structural

identifications of the means plus function terms.  WebSideStory's arguments are without merit and

should be rejected by the Court.

WebSideStory argues that the only structure in the '637 patent is a Java applet, contending

that this is the only "program that is actually disclosed in the specification."  This argument must

fail for at least two reasons.  First, it disregards entirely how it is that structure is identified in the

context of computer program claims, according to the Federal Circuit.  As set forth in *WMS*

*Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1349 (Fed. Cir. 1999), the structure is determined

by the **<u>algorithms</u>** disclosed in the specification, not what specific computer **<u>language</u>** is disclosed.

Second, the '637 patent clearly states the computer program of the invention is not limited to a Java

applet, which is simply described as one embodiment wherein a particular programming language

is used and that other languages may also be used.  For example, the '637 patent describes that

"aspects of the invention can be implemented as one or more computer programs that can be

executed by a computer to achieve the functionality of that aspect.  Generally, such computer

programs can be implemented using any appropriate computer programming language."  '637

patent, col. 11, ll. 38-46.  Although WebSideStory acknowledges this discussion in the

---

[18]  In its brief, WebSideStory omits claim 33 of the '637 patent as a claim the parties agree is subject to means plus function treatment.  *See* JCCC, rows 39 and 40.  Additionally, the parties disagree as to what extent of the claim language of claims 39 and 40 is subject to means plus function treatment.  *Id.*

specification, it argues that the statement is irrelevant because "there is no teaching as to what other structures may be used." WSS Br. at 26, n. 17. Following WebSideStory's reasoning in this regard would have absurd consequences however: every applicant would be required to discuss in detail every possible language in which the invention could be implemented, and provide examples from each such language to satisfy the written description requirement. NetRatings' position, and not WebSideStory's, is consistent with the law. In *CCS Fitness v. Brunswick Corp.*, the Federal Circuit held that "[i]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, [the court] will generally construe the term to cover all known types of structure that the patent disclosure supports." *CCS Fitness v. Brunswick Corp*., 288 F.3d 1359, 1366 (Fed. Cir. 2002). While an accused infringer may "narrow a claim term's ordinary meaning . . . he cannot do so by simply pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *Id. See also Fonar Corp. v. General Elec. Co*., 107 F.3d 1543, 1549 (Fed. Cir. 1997) ("[a]s a general rule, where software constitutes part of a best mode of carrying out an invention, description of such a best mode is satisfied by a disclosure of the functions of the software. This is because, normally, writing code for such software is within the skill of the art, not requiring undue experimentation, once its functions have been disclosed.")

WebSideStory also argues in its brief that the Java applet must (1) cause content to be displayed and (2) monitor aspects of that display. WSS Br. at 25. As with the overwhelming number of constructions proposed by WebSideStory, these purported requirements have no justification. WebSideStory simply cites to examples from the specification that describe embodiments where these features are both present. The fact is that the '637 patent discloses multiple embodiments, including some in which the computer program which monitors also causes

the display of the content, and some in which it does not, as in the case where a browser causes the

display.  *See, e.g.,* '637 patent, col. 11, ll. 59 - 67 ("In a particular embodiment . . . a set of

instructions . . . can be used to cause execution of an applet that both displays content and monitors

the display."); col. 6, l. 62 - col. 7, l. 3 ("the invention is particularly useful in monitoring the

display of content obtained over such a network using an interactive browser to acquire and view

the content in real time.").  A proper construction cannot exclude described embodiments.  *See*

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d at 1583 (defining a claim which excludes a preferred

embodiment "is rarely, if ever, correct").  Moreover, the claims themselves distinguish between the

varied embodiments.  *Compare* claim 64 (containing "instructions for causing content to be

displayed by the computer system") *with* other claims of the '637 patent (not containing an element

of "causing content to be displayed").

### 2.    *Specific Means Plus Function Terms of the '637 Patent*

In its brief, WebSideStory contends that at least several of the claims of the '637 patent are

indefinite.  As discussed above, consideration of validity issues during claim construction is

inappropriate.  *Supra* at Point III.  Moreover, even if the Court were to consider such issues at this

juncture, WebSideStory has not even come close to producing the quality or quantity of evidence

which would be required to give its positions a modicum of legitimacy.  *See*, *e.g.*, *Glaxo Group*

*Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (invalidity must be shown by "clear and

convincing evidence."); *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1356 (Fed. Cir.

2003) (same).  Further, WebSideStory ignores descriptive discussions throughout the specification

which would disprove its arguments, including in sections adjacent to those it does cite.  For

instance, in arguing that there is inadequate disclosure for the term "means for evaluating the

change in time of the characteristic of the content display to produce monitoring information,"

WebSideStory cites to the '637 patent, col. 16, l. 63 - col. 17, l. 2 as being the only description of

the term.  WSS Br. at 28.  Yet, WebSideStory entirely omits the fact that the **very next sentence** in the specification states: "Either of the two examples given immediately above (hiding of the content display and entry of a pointer into a defined area) are also examples of a monitoring method in accordance with this embodiment of the invention."  '637 patent, col. 17, ll. 2-6.  No doubt, WebSideStory's failure to point this out reflects its awareness that it completely undermines WebSideStory's position that there is no detailed discussion of the embodiment.  Indeed, those "examples" are described in detail over several columns of the patent.  *See, e.g.,* '637 patent, col. 14 - col. 16.

With respect to specific function and structural identifications, WebSideStory's constructions should be rejected at least because they unnecessarily construe terms that have very plain, straightforward meanings with respect to the functions of the claims at issue, and are unduly narrow in excluding many algorithms identified in the '637 patent.  In some cases, WebSideStory is deceptive in its argument, citing case law which mandates that all disclosed embodiments be covered by the structural identification in support of its constructions which, in fact, limit the structure to just some of the embodiments in the specification.  *See* WSS Br. at 30 (setting out only certain specific embodiments WebSideStory contends must be the structure, but then citing to *Micro Chem* in support of this limited construction even though the *Micro Chem* case actually holds, as quoted by WebSideStory, that all embodiments in the specification should be included, not just a few as WebSideStory's construction contains).  Indeed, WebSideStory's approach violates two basic tenets governing construction of means plus function claims:

> First, a court may not construe a means-plus-function limitation "by adopting a function different from that explicitly recited in the claim."  . . . Second, a court errs "by importing the functions of a working device into the specific claims, rather than reading the claims for their meaning independent of any working embodiment

*JVW Enters. v. Interact Accessories, Inc.* 424 F.3d 1324, 1331 (Fed. Cir. 2005) (reversing lower

court's determination of functions which were "not recited explicitly in the claim but rather relate

to a working embodiment disclosed in [patent's] written description").

For the foregoing reasons, WebSideStory's constructions and identification of structure for

the '637 patent should be rejected and NetRatings' constructions be the order of the Court.

### 3. *"Instructions" Terms of the '637 Patent*

As explained in NetRatings' opening brief, WebSideStory's contention that the

"instructions" elements of claims 57, 59, 62, 64 and 65 of the '637 patent, should be treated as

means-plus-function elements subject to 35 U.S.C. § 112(6) is incorrect.  NetRatings Br. at 41-42.

In its brief, WebSideStory makes four arguments in support of its contention, none of

which are sufficient to overcome the presumption that the instructions claim elements, which do

not recite means for language, are not subject to 112 ¶ 6.  *See Phillips,* 415 at 1311 (absence of

such language creates a rebuttable presumption that 35 U.S.C. § 112(6) does not apply).  Courts

have "seldom held that a limitation not using the term 'means' must be considered to be in means-

plus-function form," and "the circumstances must be [unusual] to overcome the presumption . . ."

*Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1356 (Fed. Cir.

2006) citing *Lighting World, Inc. v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1362 (Fed. Cir.

2004).

WebSideStory first contends that NetRatings is collaterally estopped from arguing that the

asserted terms of the '637 patent are instructions terms based on an Order issued by the District

Court for the District of Delaware.[19]  WebSideStory's contention is neither supported by the law

---

[19]  The case was a patent infringement suit instituted by NetRatings against Coremetrics, Inc., *NetRatings, Inc. v. Coremetrics, Inc.*, Case No. 05-314 (D. Del. 2005).  In that case, the parties engaged in initial Markman briefing and a Markman hearing, subsequent to which the District Court issued an Order

or the facts.  Collateral estoppel is applicable where each of the following four elements is present: "First, the issues raised in both proceedings must be identical.  Second, the relevant issues must have actually been litigated and decided in the prior proceeding.  Third, the party to be estopped must have had a full and fair opportunity to litigate the issues in that prior proceeding.  And fourth, resolution of the issues must have been necessary to support a valid and final judgment on the merits."  *TM Patents, L.P. v. Int'l Bus. Machines Corp.*, 72 F. Supp. 2d 370, 372 (S.D.N.Y. 1999).  WebSideStory does not even attempt to show that these four requirements are met, nor could it succeed in doing so as the second and fourth prongs are clearly not met in this case.  With respect to the second prong, the issue for which WebSideStory seeks to preclude NetRatings was not actually decided.  The August 2, 2006 Order to which WebSideStory cites was, in fact, an Order for supplemental briefing on claim construction issues.[20]  With respect to the fourth prong, the issues were not necessary to a final judgment on the merits.  In fact, proceedings in the *Coremetrics* case have been halted since the summer during settlement negotiations between the parties, which resulted in a settlement agreement being finalized in late September of this year, prior to issuance of a Markman ruling, prior to any expert reports being exchanged, and prior to any trial or pre-trial proceedings occurring.[21]  In addition, NetRatings has

---

directing the parties to file additional briefing regarding Markman issues.  *See* electronic case docket for *NetRatings, Inc. v. Coremetrics, Inc.,* at A115 (Louis Decl. Ex. 17) and Bennett Decl., Ex. 21 (Order).

[20]  Although the Court's Order stated it was being issued in view of the Judge's views as to certain instructions claims at that time, no *Markman* ruling was issued and no further orders were entered with respect to the supplemental briefing that occurred.  *See* App. Ex. 17.  Note for instance, the distinction between the Order at issue in this instance, versus that of the *TM Patents* case (on which WebSideStory relies).  In *TM Patents,* the prior decision being assessed by the Court was a *Markman* ruling, and the *TM Patents* Court specifically stated that the Judge in the prior decision " issued a very thorough ruling, disposing of all disputed issues."  *TM Patents,* 72 F. Supp. at 376 (the court also noted that "[a]fter ruling, [the prior judge] entertained reargument and made several modifications.  He then read his ruling to the jury on the first day of trial, in a preliminary jury instruction.).

[21]  NetRatings notes the discussion by the Court in the *TM Patents* regarding whether the fact that parties have settled prior to judgment or appeal should have any bearing on the application of collateral estoppel, and the Court's apparent conclusion therein that it should not.  *See TM Patents,* 72 F. Supp. at 378.

moved to vacate the Order for Supplemental Briefing.  *See* A115 (Louis Decl. Ex. 17).  *See TM*

*Patents,* 72 F. Supp. 2d at 378 (that the Markman ruling had not been vacated was significant to

Court's decision as to finality and preclusive effect).

WebSideStory's second argument is that the claims are written such that the phrases

"means for" and "instructions for" are used interchangeably.  WSS Br. at 23-24.  However,

WebSideStory's conclusion entirely disregards the preamble of every "instructions" claim, which

preamble is not within the "means for" claims: "**A computer readable medium** encoded with one

or more computer programs … comprising instructions . . . "  '637 patent, claims 57, 59, 64 and

65 (emphasis supplied).  Thus, in fact, each claim in which "instructions for" appears is a

computer media claim, which provides more than sufficient structure in and of itself, and plainly

distinguishes the instructions claims from the means claims.

---

However, there are quite a few reasons why *TM Patents* should not be treated as controlling, or persuasive. First, the decision has been criticized for a variety of reasons, it stands largely alone in an area of law that is in many respects still developing (note that *Markman* is just over ten years old), and the issues addressed by *TM Patents* do not appear to have been addressed directly by the appellate courts.  *See, e.g., Kollmorgen Corp. v. Yaskawa Elec. Corp.,* 147 F. Supp. 2d 464, 469-70 (W.D. Va. 2001) (criticizing *TM Patents*).  *See also* COLLATERAL ESTOPPEL OF CLAIM INTERPRETATION AFTER MARKMAN, 86 Minn. L. Rev. 1581, 1616-1623 (June, 2002).  There is no real uniformity in terms of the application of collateral estoppel principles to *Markman* rulings in any event, and to the extent there appears to be a trend, it is for such rulings to be given no preclusive effect.  *See, e.g., Kollmorgen Corp. v. Yaskawa Elec. Corp.,* 147 F. Supp. 2d at 469-70 (holding that collateral estoppel is not applicable to claim interpretation); *Graco Children's Prods., Inc. v. Regalo Int'l, LLC,* 77 F. Supp. 2d 660, 664-65 (E.D. Pa. 1999) (same).  *But see Edberg v. CPI-The Alternative Supplier, Inc.,* 156 F. Supp. 2d 190, 195-96 (D. Conn. 2001) (holding collateral estoppel applies to claim construction).  Further, respectfully, the Court in *TM Patents* did not adequately consider the chilling effect which would result if *Markman* decisions are given preclusive effect where the parties settle before final judgment.  Patent owners who might otherwise resolve disputes for business and efficiency reasons, will be discouraged from doing so simply because of the potential effect that a claim construction ruling might have in another case.  The drain on resources for the Courts as well as parties involved when discouraging early resolution of disputes, in particular, is not insubstantial.  *See, e.g., Kollmorgen*, 147 F. Supp. 2d at 468 ("Parties to a settlement will lack any incentive to settle if the virtually unreviewable *Markman* ruling will have a preclusive effect on other potential patent actions."); COLLATERAL ESTOPPEL, 86 Minn. L. Rev. at 1623.  Indeed, it would negate the policy behind application of collateral estoppel principles in the first instance, which is itself to reduce unnecessary litigation and promote comity between the courts.  *See Allen v. McCurry*, 449 U.S. 90, 95-96 (1980).

WebSideStory also argues that the patentee and the patent examiner during prosecution treated the instructions and means terms interchangeably.  WSS Br. at 24.  However, shorthand references to facilitate the discussion of claim terms other than "instructions" is inadequate to prove what the applicant or the examiner believed the term "instructions" meant.  Moreover, with respect to the applicant, if it was intended that the claim terms mean the same thing, the same term would have been used.  That is, the fact that there are two types of claims, which each use different words, gives rise to an additional presumption that the claims have different scope. *Tandon*, 831 F.2d at 1023 ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").  In addition, WebSideStory cites to the Notice of Allowance in support of this argument, but the law rejects use of a Notice of Allowance to limit or construe claims in this fashion.  *See Eolas*, 399 F.3d at 1338 (limiting use of notice because there is no obligation to respond).

In a final attempt to overcome the strong presumption against WebSideStory's position, WebSideStory contends that the instructions elements should be treated as means elements because the term "instructions" "does not connote any definite structure to one of skill in the art, but is simply a generic term for any statement written in any computer programming language telling a computer to do something."  WSS Br. at 24.  However, WebSideStory does not cite to any case law which actually supports this conclusion.  In fact, as identified by NetRatings in its opening brief, there is case law which directly contradicts WebSideStory's position.  NetRatings Br. at 42 (discussing *Affymetrix, Inc. v. Hyseq, Inc.,* 132 F. Supp. 2d 1212, 1231 (N.D. Cal. 2001) ("§ 112, P 6 does not apply to the terms recited in the form, "computer code that [performs x function];" "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions.").  As

explained in NetRatings' opening brief, "instructions" for performing a given function are clearly equivalent to "computer code" for performing a given function.  Moreover, even if "instructions" are considered to be a general category of structure, as WebSideStory appears to argue, this is not sufficient to overcome the presumption.  As discussed in *Lighting World*, "[i]n considering whether a claim term recites sufficient structure to avoid application of § 112 P 6, we have not required the claim term to denote a specific structure."  *Lighting World* at 1359.  Instead "it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function."  *Id.*  "Instructions" is clearly a term that is "used in common parlance or by persons of skill in the pertinent art," as recognized by WebSideStory.  WSS Br. at 24.

For at least the above reasons, WebSideStory's arguments concerning the instructions elements in claims 57, 59, 62, 64 and 65 of the '637 patent should be rejected.

**CONCLUSION**

For all the reasons stated above, NetRatings requests that the disputed claim terms be construed in the manner proposed by NetRatings in the Joint Claim Construction Chart.

Dated: October 27, 2006                    Respectfully submitted,

                                           **DREIER LLP**


                                           By: /s/ Seth H. Ostrow
                                               Seth H. Ostrow (SO 9605)
                                               Arianna Frankl (AF 7764)
                                                Karine Louis (KL 6652)

                                           499 Park Avenue
                                           New York, New York 10022
                                           (212) 328-6100

                                           Attorneys for Plaintiff NetRatings, Inc.

41